[No. S004691. Crim. No. 24589. May 8, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRE BURTON, Defendant and Appellant.

848

COUNSEL

Samuel Jackson, under appointment by the Supreme Court, and L. Marshall Smith for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Gary R. Hahn, Donald E. de Nicola, Ernest Martinez and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PANELLI, J.—This case is before us on an automatic appeal from a judgment of death. Defendant Andre Burton was convicted in the Superior Court of Los Angeles County (Fagan, Judge) of murder (Pen. Code, § 187)[1] with personal use of a firearm (§ 12022.5), three counts of robbery (§ 211) with personal use of a firearm (§ 12022.5) and, in one instance, with intentional infliction of great bodily injury (§ 12022.7). The jury also found true the special circumstance allegation that the murder was committed in the course of a robbery. (§ 190.2, subd. (a)(17)(i).)

We affirm the judgment in its entirety.

SUMMARY OF EVIDENCE

The prosecution evidence was that about 1 p.m. on February 25, 1983, defendant approached a pickup truck in a parking lot of a K-Mart store in Long Beach. As the driver was about to get out of the truck, defendant pointed a gun into the truck and demanded money from her and her passenger. Both women complied. Defendant ordered them to put their purses on the floor of the truck and said if they were hiding money he would kill them. He ordered the driver to drive off without looking back. At the preliminary hearing and during trial, the passenger positively identified defendant as the robber.

A little after 1 p.m. the same day, Anwar Khwaja picked up a cloth bank bag containing $190 in coins from a Long Beach branch of the Bank of America. He then drove to his mother's residence with his nine-year-old daughter. He remained in the car while his daughter went to summon his mother and sister. As his mother and sister approached his car, Mr. Khwaja

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

saw defendant walk up to the driver's side of the car. Defendant pointed a gun at Khwaja's face and demanded money. Khwaja told defendant to take the money. Defendant shot him in the forehead, again demanding money, then shot him through the eye. Though Khwaja lost an eye, he retained consciousness and could see with the remaining eye. He saw defendant take the money bag, smiling or laughing contentedly. He saw defendant shoot his mother, Gulshakar Khwaja, as she approached. She died of a gunshot wound to the lung and heart. He saw defendant stride off with the money bag. Khwaja retained consciousness until an ambulance arrived. He positively identified defendant at trial.

Neighbors heard the shooting. Robert Cordova testified that shortly after 1 p.m. on February 25, 1983, he looked out the window and saw defendant running down the street carrying a gun and a white canvas bag. Cordova's brother shouted at defendant, and defendant looked at them and chuckled. Defendant ran to an alley and got into a red truck, which drove off. Cordova positively identified defendant at the preliminary hearing and trial.

Within two days defendant had been arrested. He initially denied involvement, then admitted his role in the offenses. Defendant's statement to the police, which was admitted in evidence, confirmed that on February 25, 1983, he met his confederate Otis Clements with the purpose of "going to go make some money today." Defendant provided a dark blue shirt with a Ford emblem on the shoulder for each of them, and they drove off in Clements's red pickup truck. Defendant admitted robbing the two women in the K-Mart parking lot.

Defendant said that after the robberies, they drove around to one or two banks looking for someone to rob. They went to the Bank of America branch. Defendant got out and walked to the front of the bank, where he saw a man emerge with a money bag. Defendant ran back to the truck and told Clements to follow the man. They followed him until he parked. Clements parked his truck in an alley, and defendant approached the man on foot. He demanded money from the man, who tried to "snatch" his gun. He shot the man in the face and grabbed the money. He was running away when a lady tried to "snatch him from behind," so he shot her, too.

Defendant said he then ran to the pickup truck and lay down on the floor while Clements drove off. They went to defendant's girlfriend's house, where they counted the money—about $100 in change. Clements was arrested before defendant gave him his share. Defendant spent the money on marijuana.

Defendant said he had sold the murder weapon to a person he would not identify. He said he burned the money bag.

On February 28, 1983, when police interrogated defendant again, defendant denied any knowledge of or involvement in the offenses and said he had made any statements about them to avoid being framed, and that he had been lying.

The defense presented no evidence.

At the penalty phase of trial, the prosecution presented evidence admitted over defense objection that in 1976, as a juvenile, defendant had committed a lewd act on a child in violation of section 288. In 1977 he committed a "residential" burglary, and in 1978, an attempted robbery. In 1979 he committed an attempted grand theft person. All of these were juvenile offenses.

This evidence was presented through the testimony of a juvenile court commissioner, who testified on the basis of defendant's official juvenile court record. He said that for the first two offenses, defendant was sentenced to a camp community placement program, and for the second two, to the California Youth Authority. He explained that the standard of proof and rules of evidence are the same in juvenile as adult court, and he described the programs and facilities of the California Youth Authority, county camps, and juvenile hall, with emphasis on the rehabilitative opportunities they provide.

The trial court also took judicial notice of defendant's February 10, 1982, guilty pleas to two counts of "residential" burglary and of his sentence to sixteen months in state prison.

Defendant presented the testimony of his mother, who testified that she had eight children, lived on Social Security and welfare, and that defendant's father had been murdered when defendant was five years old. Four of her five boys and one of her three girls had had trouble with the law. Up to the age of 13, defendant did fairly well in school. He was always a good boy at home, sometimes attended church and had been taught right from wrong. He started having trouble because of fighting at school, then was removed from her home intermittently for juvenile placement. He was a loner, but got along well with his siblings.

A Los Angeles County deputy sheriff testified that defendant had been in his area of the county jail for two months; he had been given privileges, was a backup trustee, was obedient and had never given any trouble.

After the jury returned a verdict of death, defendant moved for a new trial on the special circumstance and the penalty on the basis of our opinion

in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (overruled by *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306]), since his jury had not been instructed on the intent-to-kill element of the felony-murder special circumstance. The trial court granted a limited new trial on the issue of intent to kill alone; the special circumstance finding and the death verdict were not disturbed. A new jury was impaneled without being questioned on their attitude toward the death penalty. They heard testimony from Mr. Khwaja and Mr. Cordova and a pathologist about the robbery and murder, which was substantially identical to the testimony at the first trial, and heard the evidence of defendant's statement to the police. Defendant stipulated that he had killed Gulshakar Khwaja, but he did not present evidence. The jury returned a finding that defendant had intended to kill the victim.

## GUILT PHASE ISSUES

### 1. *Faretta Motion.*

On the day the case was sent to the trial department for trial, defendant moved to represent himself. The trial court denied the motion as untimely, and jury selection began the following day. Defendant urges that this was error, arguing that the trial court did not conduct a meaningful hearing on the motion and a proper hearing would have disclosed that the motion was timely.

■ A defendant has a federal constitutional right to represent himself if he voluntarily and intelligently elects to do so. (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].) In order to invoke an unconditional right of self-representation, the defendant must assert the right "within a reasonable time prior to the commencement of trial." (*People* v. *Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187], cert. den. *sub nom. Windham* v. *California* (1977) 434 U.S. 848 [54 L.Ed.2d 116, 98 S.Ct. 157]; see also *People* v. *Joseph* (1983) 34 Cal.3d 936, 943 [196 Cal.Rptr. 339, 671 P.2d 843].) A motion made after this period is addressed to the sound discretion of the trial court. (*People* v. *Windham, supra,* 19 Cal.3d at p. 128; *People* v. *Hernandez* (1985) 163 Cal.App.3d 645, 650 [209 Cal.Rptr. 809].)

The "reasonable time" requirement is intended to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice. "For example, a defendant should not be permitted to wait until the day preceding trial before he moves to represent himself and requests a continuance in order to prepare for trial without some showing of reasonable cause for the lateness of the request. In such a case

the motion for self-representation is addressed to the sound discretion of the trial court which should consider relevant factors such as whether or not defense counsel has himself indicated that he is not ready for trial and needs further time for preparation." (*People* v. *Windham, supra,* 19 Cal.3d 121, 128, fn. 5; see also *People* v. *Joseph, supra,* 34 Cal.3d 936, 944, fn. 2.) We directed trial courts to consider the "quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*People* v. *Windham, supra,* 19 Cal.3d at p. 128; see also *People* v. *Hamilton* (1985) 41 Cal.3d 408, 421 [221 Cal.Rptr. 902, 710 P.2d 981].)

Defendant did not invoke his right to self-representation until after the case had been called for trial, both counsel had answered ready, and the case had been transferred to a trial department for pretrial motions and jury trial. Voir dire began the next day; the jury was impaneled three court days later. Defense counsel had represented defendant for six months, since the preliminary hearing, and defendant had had several court appearances in which he could have invoked his right to represent himself. Defendant asserted he was not ready to go to trial and needed an unspecified period for preparation. Under the circumstances, the motion was clearly directed to the sound discretion of the trial court. (See *People* v. *Hamilton, supra,* 41 Cal.3d 408, 419-421 [motion made during pretrial motion to suppress and again during jury selection]; *People* v. *Ruiz* (1983) 142 Cal.App.3d 780, 790-792 [191 Cal.Rptr. 249] [motion made three days before trial]; *People* v. *Morgan* (1980) 101 Cal.App.3d 523, 531 [161 Cal.Rptr. 664] [motion made just before jury selection]; *People* v. *Hall* (1978) 87 Cal.App.3d 125, 132-133 [150 Cal.Rptr. 628] [same].)

Defendant argues that we should follow the federal rule, which is that a motion for self-representation is normally timely as a matter of law if made before the jury is impaneled, so that the motion must be granted unless it is shown that the motion is made for the purpose of delay. (*Armant* v. *Marquez* (9th Cir. 1985) 772 F.2d 552, 555, cert. den. *sub nom. Bunnell* v. *Armant* (1986) 475 U.S. 1099 [89 L.Ed.2d 902, 106 S.Ct. 1502]; *Fritz* v. *Spalding* (9th Cir. 1982) 682 F.2d 782, 784; *Maxwell* v. *Sumner* (9th Cir. 1982) 673 F.2d 1031, 1036, cert. den. 459 U.S. 976 [74 L.Ed.2d 291, 103 S.Ct. 313]; *Chapman* v. *United States* (5th Cir. 1977) 553 F.2d 886, 894; *United States* v. *Dougherty* (D.C. Cir. 1972) 473 F.2d 1113, 1124 [154 App.D.C. 76]; *United States* ex rel. *Maldonado* v. *Denno* (2d Cir. 1965) 348 F.2d 12, 16; but see *Robards* v. *Rees* (6th Cir. 1986) 789 F.2d 379, 383-384 [suggesting that a motion made on day of trial is within court's discretion to deny if accompanied by motion for continuance].)

The federal rule, though it calls motions timely until the jury is impaneled, may in practice differ little from our own rule. It is within the court's discretion to deny a motion made before the jury is impaneled if the court finds the motion is made for the purpose of delay. (*Fritz* v. *Spalding, supra,* 682 F.2d 782, 784.) The fact that the granting of the motion will cause a continuance, and that this will prejudice the People, may be evidence of the defendant's dilatory intent. Similarly, the defendant's pretrial delays, in conjunction with a motion for continuance for the purpose of self-representation, would be strong evidence of a purpose to delay. (*Ibid.*; see also *Robards* v. *Rees, supra,* 789 F.2d 379, 383-384 [motion for continuance alone may justify denial of *Faretta* motion].) In most of the cases finding a motion timely as a matter of law, no continuance would have been necessary. (See *Maxwell* v. *Sumner, supra,* 673 F.2d 1031, 1035; *Chapman* v. *United States, supra,* 553 F.2d 886, 895; *United States* v. *Dougherty, supra,* 473 F.2d 1113, 1119, 1124; *United States* ex rel. *Maldonado* v. *Denno, supra,* 348 F.2d 12, 16.) In the instant case, although the motion would be termed timely under the federal rule, the trial court would still have discretion to deny the motion if it considered it entered for the purpose of delay. This differs little as a practical matter from the standard we set out in *Windham, supra,* 19 Cal.3d 121, except that we place the burden on the defendant to explain his delay when he makes the motion as late as defendant did here. ■ To the extent that there is a difference between the federal rule and the California rule, we find the federal rule too rigid in circumscribing the discretion of the trial court and adhere to the California rule. (See also *People* v. *Moore* (1988) 47 Cal.3d 63, 80-81 [252 Cal.Rptr. 494, 762 P.2d 1218].)[2]

■ The court in the case at bench inquired into the basis for defendant's dissatisfaction with counsel, counsel's experience and level of preparation for trial, and defendant's need for continuance. The court gave defendant an unlimited opportunity to explain why he felt he should represent himself. Although defendant apparently had not shown a previous proclivity for substituting counsel, this factor alone does not undermine the court's conclusion that to grant the motion would unjustifiably delay trial or obstruct the orderly administration of justice. Defendant had had several opportunities before the case was called for trial to move to represent himself, and he failed to state any cause for the delay in his request. There was no abuse of discretion in the court's denial of the motion.

---

[2] We are of course not bound to follow the authority of the federal courts of appeals, though their decisions are entitled to great weight. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr 457, 460 P.2d 129].)

2. *Substitution of Counsel.*

■ Defendant next argues the trial court should have inquired whether he wanted to substitute counsel instead of representing himself. (See *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) He maintains the court should have discerned he wanted to substitute counsel and, alternatively, given his express dissatisfaction with counsel, the court should have informed him of his right to ask for substitute counsel. Finally, defendant contends the court abused its discretion in failing to grant a continuance to allow him to substitute counsel.

*People v. Marsden, supra,* 2 Cal.3d 118, 124, stands for the principle that it is an abuse of discretion to deny a defendant who seeks substitution of attorneys an opportunity to explain the reasons for his request. However, "the decision to allow a substitution of attorney is within the discretion of the trial judge 'unless there is a sufficient showing that the defendant's right to the assistance of counsel would be substantially impaired if his present request was denied.'" (*People v. Smith* (1985) 38 Cal.3d 945, 956 [216 Cal.Rptr. 98, 702 P.2d 180], quoting *People v. Carr* (1972) 8 Cal.3d 287, 299 [104 Cal.Rptr. 705, 502 P.2d 513].)

In the instant case there is no basis in the record for the view the court should have realized defendant was making a motion, not to represent himself, but to substitute counsel. Although defendant expressed dissatisfaction with his attorney, he made repeated, explicit requests to represent himself and gave reasons why he thought he would be more persuasive and effective than counsel. He never suggested he would like a different attorney. (Cf. *People v. Marsden, supra,* 2 Cal.3d at p. 121.) Nor is it the rule that whenever a defendant makes a motion to represent himself on the basis of dissatisfaction with counsel, the court automatically should inquire whether he would like to make a motion for substitution of counsel. (*People v. Wright* (1977) 72 Cal.App.3d 328, 338-340 [140 Cal.Rptr. 98]; accord, *People v. Solomos* (1978) 83 Cal.App.3d 945, 951-952 [148 Cal.Rptr. 248].) As we noted in *People v. Joseph, supra,* 34 Cal.3d 936, 944, footnote 3, the two motions are fundamentally different, one raising the question of defendant's competency to waive his right to counsel, and the other raising the question of existing counsel's competency.

Here, in any event, the court gave defendant a full opportunity to express his reasons for dissatisfaction with counsel, to wit, counsel's asserted failure to investigate defendant's alleged alibi or his assertions that he was being framed and the police had falsified his confession. Counsel stated he had investigated defendant's allegation he was framed, he had conducted other investigation that he did not wish to divulge to the court, he was fully

prepared, and he could say nothing further about his investigation except he would answer any direct questions from defendant. None was forthcoming. Defendant thus failed to show his right to counsel would be "substantially impaired" by proceeding to trial with his appointed counsel. (*People* v. *Marsden, supra,* 2 Cal.3d at p. 123; see *People* v. *Walker* (1976) 18 Cal.3d 232, 238 [133 Cal.Rptr. 520, 555 P.2d 306]; *People* v. *Williamson* (1985) 172 Cal.App.3d 737, 746 [218 Cal.Rptr. 550].)

Defendant contends that counsel's inadequate representation is demonstrated by his failure to present defendant's subsequent motion, made at the close of the prosecution's case, to represent himself. The record shows that at the close of proceedings the previous day the court had denied defendant's identical motion. Defendant acknowledged he had nothing new to add. In the circumstances, counsel was not required to prepare a written motion on defendant's behalf; it was sufficient to permit defendant orally to address the court, which he did. (Cf. *People* v. *Moore, supra,* 47 Cal.3d at p. 83.)

3. *Defendant's Right to Insist on Presentation of a Defense.*

■ Defendant maintains the judgment must be reversed because his counsel failed to accede to his desire to put on a defense at the guilt phase.[3] Defendant argues on the basis of the plurality opinion in *People* v. *Frierson* (1985) 39 Cal.3d 803 [218 Cal.Rptr. 73, 705 P.2d 396] that both counsel and the trial court interfered with his fundamental right to elect to put on a defense.

The plurality opinion in *Frierson* held that defense counsel does not have authority to refuse to present a defense at the guilt phase of a capital trial "in the face of a defendant's openly expressed desire to present a defense at that stage and despite the existence of some credible evidence to support the defense." (39 Cal.3d 803, 812, 817-818.) We did not reach the question whether a defendant has a right to insist on the presentation of a defense which has no credible evidentiary support or which no competent counsel would use, since counsel in *Frierson* actually presented the evidence defendant wanted used in his defense, but insisted on presenting it at the penalty phase rather than at the guilt phase. (*Id.,* at p. 815, fn. 3.) We also were not presented with the question of what counsel should do when his client

---

[3]Defendant conceded by letter, received before oral argument, that the appellate record did not support his claims of ineffective assistance of counsel made in his opening brief. He withdrew those arguments, and they are not discussed here. We summarily denied defendant's petition for writ of habeas corpus, which raised the issue of ineffective assistance of counsel.

insists on presenting what appears to counsel to be a defense based on perjury, as a false alibi defense. (*Id.*, at p. 817, fn. 6.)

Here, defendant claims he made it clear to the court and counsel that he wanted to put on a defense at the guilt phase.[4] The record shows only that defendant alluded to possible defenses of mistaken identity, conspiracy to frame him, police manufacture of the confession, and alibi.

Defendant's reliance on *Frierson, supra,* 39 Cal.3d 803, is misplaced, since the record does not show that any defense he wished to present had credible evidentiary support.[5] Indeed, it is far from clear on this record that defendant did insist on presenting any particular defense; his comments were mostly directed to the question whether counsel had adequately investigated. With the exception of some impeachment evidence against Otis Clements, who did not testify, defendant did not allege there was a particular piece of evidence he wanted presented that counsel refused to present, or even that he wanted to testify himself.[6] Even in this appeal defendant does not specify what defense it was he wanted to present.

Defendant argues the trial court had an obligation to inform him that he had the right to insist on the presentation of a defense. For this proposition he cites only *People* v. *Marsden, supra,* 2 Cal.3d 118, 125-126, where we said that a trial court may help a defendant to present his complaint against counsel, when the defendant is groping for the proper manner in which to

---

[4] Defendant refers to his statements in the course of his motion for self-representation and to his declaration filed in support of his second motion for new trial. During his motion for self-representation, defendant told the court that counsel's investigation report failed to support the "realness" of his alibi, and that if he were to represent himself, he could show that he was not the person who should be "taking the fall" in the case. He objected that counsel did not want to present evidence that Otis Clements was trying to frame defendant for another murder, which evidence would show defendant should not be taking "the fall" in this case. Defendant insisted that he needed to do more investigation, and that his investigator was on his side and believed that "something about this case [ ] is very shaky."

Defendant then urged that the investigation of his alibi contained falsehoods, and that he did not make the incriminating statement to the police contained in the police reports. Defendant said he wanted to investigate whether the police had been guilty of framing defendants in the past. He concluded that his attorney had told him he did not think they would win the case and there was nothing he could do about it.

In defendant's declaration in support of his second motion for new trial, the only statement which relates to the desire to put on a defense is: "I did know from our investigator that a witness had been located who gave a different description of the person who did the shooting of Mr. and Mrs. Khwaja, and I wanted to know why that witness had not been subpenaed to come to court."

[5] As the court commented, "counsel is not a magician."

[6] After the prosecution's case-in-chief, when defense counsel asked for a brief continuance to interview two witnesses who might testify for the defense, counsel said that defendant had "indicated" he would not testify. Defendant did not object that he wanted to testify, or that he was not testifying at counsel's insistence.

demonstrate the attorney's alleged lack of competence. We certainly did not impose a duty on the court to advise defendants who are represented by counsel that they have the right to put on some defense or particular defenses. Indeed, in *Frierson* itself we emphasized that in the absence of an explicit indication of a conflict over whether to present a defense, the court has no duty to inquire into the defendant's concurrence with his attorney's actions. (*People* v. *Frierson, supra,* 39 Cal.3d 803, 818, fn. 8.) Defendant's statements before trial, made in the context of a motion for self-representation and consisting almost entirely of an accusation that counsel had failed to investigate or take an interest in the case, did not explicitly indicate there was a conflict over whether to present a defense at all. Nor does the record indicate that at that stage of the proceedings counsel had decided not to put on any defense evidence. To the contrary, as would have been apparent to the court, counsel was still considering putting on a defense case when, after the prosecution case, he obtained a brief continuance to interview two potential defense witnesses. In the absence of an express conflict over whether to put on any defense case, and in the absence of any credible defense evidence, the court had no duty to advise defendant he had the right to insist that counsel put on a defense case at the guilt phase.[7]

### 4. *Intent to Kill.*

Defendant contends on the basis of *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, that the special circumstance finding and penalty judgment must be reversed because the jury that heard the guilt and penalty phases of trial were never instructed that intent to kill is an element of the felony-murder special circumstance. He argues the trial court erred in granting him only a limited retrial on the issue of intent to kill, without vacating the special circumstance finding and death judgment, and that the jury's finding of intent to kill at the limited retrial cannot be used to cure the error in the original guilt and penalty trials.

---

[7]Defendant's contention that: "[T]he record also shows that the court and Mr. Slick [defense counsel] informed him that he had no voice in deciding whether to put on a defense" is not supported by the record. Nothing defense counsel said suggested anything of the kind. Defendant refers to remarks the court made in the course of the *Faretta* motion, *supra,* 422 U.S. 806, with emphasis on the following: "You have been given a lawyer. He has been accorded funds for your investigation. He has conducted an investigation. He has a lot of experience and I don't know how you could ask for much more than you have already asked for." The context indicates the court was expressing confidence that counsel had done the investigation necessary for proceeding to trial, not that it was telling defendant he had no control over the decision whether to put on a defense. During the same discussion, the court advised defendant he could testify if he wanted to, that his and counsel's job was to put on testimony so the truth of the police report could be determined, and that the jury would make its decision after hearing both sides. None of these remarks conveyed the idea that if counsel were to decide not to put on a defense, defendant would have no recourse.

Defendant made his motion for new trial on the basis of *Carlos, supra,* 35 Cal.3d 131. He moved the court to strike the special circumstance finding and the death judgment and order retrial of both. The district attorney argued for a limited retrial, so that a jury that had not been voir dired for attitudes to the death penalty could be impaneled to decide only the issue of intent to kill. The court agreed with the district attorney's suggestion.

We find it unnecessary to determine the propriety of the limited retrial, as this court has held that intent to kill is not an element of the felony-murder special circumstance, at least when the defendant is the actual killer. (*People v. Anderson, supra,* 43 Cal.3d 1104, 1138-1139; see *People v. Malone* (1988) 47 Cal.3d 1, 25 [252 Cal.Rptr. 525, 762 P.2d 1249] [*Anderson* applies to murders committed before the *Carlos* decision].) Under *Anderson,* the original special-circumstance finding in this case must be sustained, since all the evidence was that defendant was the actual killer if he was involved at all.

## PENALTY PHASE ISSUES

1. *Errors in Admission of Evidence.*

 (a) *Commissioner Fletcher's Testimony.*

As a juvenile, defendant was adjudicated a ward of the court pursuant to Welfare and Institutions Code section 602 on four occasions. At the penalty phase of trial the prosecution called Juvenile Court Commissioner Fletcher to testify for the purpose of "establish[ing] a foundation" for defendant's juvenile court file, i.e., to describe the juvenile court process, including the rights afforded juveniles and the standards for adjudication, to read the charges against defendant, and to describe the dispositions in defendant's cases and the rehabilitative programs available at the institutions to which defendant was committed. Defense counsel objected on grounds defendant's juvenile adjudications were not felony convictions and any testimony by Commissioner Fletcher concerning rehabilitation efforts on defendant's behalf would be speculative. The court overruled the objection, stating the commissioner's testimony would not demonstrate rehabilitation efforts in defendant's case. The commissioner thereupon testified much as the prosecutor had proposed.

■ Defendant first argues that much of Commissioner Fletcher's testimony was irrelevant to any statutory factor in aggravation and so inadmissible under *People v. Boyd* (1985) 38 Cal.3d 762, 773-776 [215 Cal.Rptr. 1, 700 P.2d 782]. In that case we examined the new language of section 190.3 enacted by the 1978 death penalty initiative and concluded: "Evidence of defendant's background, character, or conduct which is not probative of

any specific listed factor would have no tendency to prove or disprove a fact of consequence to the determination of the action, and is therefore irrelevant to aggravation." *(Id.,* at p. 774.) Pursuant to *Boyd,* defendant is correct that Commissioner Fletcher's testimony concerning the juvenile court system and rehabilitation programs was inadmissible as not bearing on any statutory factor in aggravation.

Respondent argues, however, that even if Commissioner Fletcher's testimony concerning the juvenile court system and placement facilities was inadmissible in the case-in-chief, it was appropriate to rebut defendant's good character evidence, to wit, the testimony of defendant's mother that he was a good boy as far as she knew and was well-behaved at home, including the intervals between confinement in juvenile facilities, and that she had taught him right from wrong and had taken him to church.

In *Boyd,* we held that the "prosecution's case for aggravation is limited to evidence relevant to the listed factors exclusive of [section 190.3] factor (k)—since that factor encompasses only extenuating circumstances. . . . Once the defense has presented evidence of circumstances admissible under factor (k), however, prosecution rebuttal evidence would be admissible as evidence tending to 'disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" *(People v. Boyd, supra,* 38 Cal.3d 762, 775-776 [248 Cal.Rptr. 69, 755 P.2d 253]; see also *People v. Babbitt* (1988) 45 Cal.3d 660, 709-710.) We explained in *People v. Rodriguez* (1986) 42 Cal.3d 730 [230 Cal.Rptr. 667, 726 P.2d 113] that a defendant who introduces good character evidence widens the scope of the bad character evidence that may be introduced in rebuttal. "The theory for permitting such rebuttal evidence and argument is not that it proves a statutory aggravating factor, but that it *undermines* defendant's claim that his *good* character weighs in favor of mercy. Accordingly, the prosecutor, when making such a rebuttal effort, is not bound by the listed aggravating factors or by his statutory pretrial notice of aggravating evidence. (§ 190.3.)" *(Id.,* at p. 791, italics in original.)

Even if the challenged evidence might have been relevant and admissible in rebuttal, it was error to admit it in the case-in-chief. We cannot speculate on what evidence defendant would have presented if the prosecutor had not presented evidence of his juvenile adjudications and the rehabilitative facilities available to juvenile offenders. Once the prosecutor had introduced the juvenile record, defendant had nothing to lose by presenting evidence exploring his character as a youth. We should not permit the prosecutor to evade the limitations on aggravating evidence that section 190.3 imposes by forcing the defendant to present evidence which opens up issues for rebuttal. We conclude that the commissioner's testimony about the procedural

protections and rehabilitative facilities available to juvenile offenders was inadmissible because it was irrelevant to any of the statutory factors in aggravation.

(b) *Juvenile Adjudication.*

Over defense objection, the prosecutor introduced evidence that on four occasions defendant had been adjudicated a ward of the court under Welfare and Institutions Code section 602. The juvenile court found true allegations that defendant had committed a lewd act on a child, a "residential" burglary, an attempted robbery, and an attempted grand theft person. The evidence was presented through the testimony of the juvenile court commissioner, who stated the contents of defendant's juvenile record; no evidence about the circumstances of the offenses was introduced.

Defendant argues that evidence of juvenile adjudications is inadmissible at the penalty phase of trial because a juvenile adjudication is neither a "prior felony conviction" within the express terms of section 190.3, factor (c), nor "criminal activity" involving violence within the terms of factor (b). He again relies on *People* v. *Boyd, supra,* 38 Cal.3d 762, 772-776, and its rule that evidence not relevant to a listed factor in aggravation is inadmissible.

The People do not dispute that juvenile adjudications are not "prior felony convictions" within the terms of section 190.3, factor (c), and we agree with defendant on this point. Welfare and Institutions Code section 203 provides that "[a]n order adjudging a minor to be a ward of the juvenile court shall not be deemed a conviction of a crime for any purpose, nor shall a proceeding in the juvenile court be deemed a criminal proceeding." This court and the Courts of Appeal have consistently agreed that adjudications under Welfare and Institutions Code section 602 are not criminal convictions. (E.g., *People* v. *Weidert* (1985) 39 Cal.3d 836, 844-847 [218 Cal.Rptr. 57, 705 P.2d 380]; *In re Joseph B.* (1983) 34 Cal.3d 952, 955 [196 Cal.Rptr. 348, 671 P.2d 852]; *Leroy T.* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 439 [115 Cal.Rptr. 761, 525 P.2d 665]; *People* v. *Sanchez* (1985) 170 Cal.App.3d 216, 218-219 [216 Cal.Rptr. 21]; see also *People* v. *Lucky* (1988) 45 Cal.3d 259, 294-295 [247 Cal.Rptr. 1, 753 P.2d 1052].)

We must assume that the voters, when they enacted section 190.3, were aware of Welfare and Institutions Code section 203 and judicial constructions of its terms. (*People* v. *Weidert, supra,* 39 Cal.3d 836, 844.) With such an awareness, the voters cannot have intended the term "prior felony conviction" contained in section 190.3, factor (c) to refer to juvenile court adjudications. We employ a presumption that when the language of a

statute uses a term that has been judicially construed, the term is used in the precise sense which the court gave it. (*Weidert, supra,* at pp. 845-846.) ■ Consistent with past decisions and in the absence of any evidence the voters intended a different interpretation for section 190.3, factor (c), we conclude evidence of juvenile adjudications is not admissible under factor (c). (See *People v. Lucky, supra,* 45 Cal.3d at pp. 294-295.)

■ We disagree, however, that section 190.3, factor (b), making evidence of criminal activity involving force or violence admissible as a factor in aggravation, excludes criminal activity of juveniles. As we stated in *People v. Lucky, supra,* 45 Cal.3d at page 295: "[T]he legislative history of the identical [factor] (b) of the *1977* law makes clear that, with respect to past *violent* acts, admissible 'criminal activity' includes evidence of misconduct, regardless of 'conviction,' which amounts to an 'actual crime, *specifically, the violation of a penal statute,*' so long as defendant was not 'acquitted.' [Citations.] The Juvenile Court Law expressly provides that a minor is eligible for wardship status 'when he violates any law . . . or . . . ordinance . . . defining crime. . . .' (Welf. & Inst. Code, § 602.) Contrary to defendant's assertion, nothing in the 1977 or 1978 laws indicates an intent to exclude violent criminal misconduct while a juvenile as an aggravating factor, simply on grounds the misconduct resulted in a juvenile wardship adjudication." (Italics in original.) The use of prior violent juvenile misconduct as factor (b) criminal activity, we observed, does not violate the proscription that a juvenile adjudication "shall not be deemed a conviction of a crime for any purpose" (Welf. & Inst. Code, § 203): "It is not the adjudication, but the conduct itself, which is relevant." (*People v. Lucky, supra,* at pp. 295-296, fn. 24.)

■ Defendant argues that as to three out of four of the juvenile adjudications, there was no evidence of the use of force or violence, so that even if juvenile adjudications are admissible under section 190.3, factor (b), it was error to introduce any but the adjudication for attempted robbery. The People concede that only the attempted robbery offense necessarily involved violence. As to the others, there was no evidence presented as to the circumstances of the offense, and the fact of the adjudication did not establish any element of violence. Evidence of nonviolent criminal activity is inadmissible, of course, under section 190.3, factor (b). (*People v. Boyd, supra,* 38 Cal.3d 762, 775-776.) Accordingly, although it was proper to introduce evidence of the attempted robbery, it was error to introduce evidence of the lewd act on a child, the burglary, and the grand theft person.

Finally, defendant maintains that proof of his juvenile adjudications by Commissioner Fletcher's testimony, based on the contents of the official superior court file, violated the hearsay rule, the best evidence rule and the

opinion rule. However, because no objection on these grounds was made below, we need not address the issue on appeal. (*People v. De Santiago* (1969) 71 Cal.2d 18, 22 [76 Cal.Rptr. 809, 453 P.2d 353]; Evid. Code, § 353.)

(c) *"Residential" Burglaries.*

In the jury's presence the trial court took judicial notice that in 1982 defendant entered pleas of guilty to two counts of residential burglary, resulting in a prison sentence. Relying on *People v. Jackson* (1985) 37 Cal.3d 826 [210 Cal.Rptr. 623, 694 P.2d 736] and *People v. Alfaro* (1986) 42 Cal.3d 627 [230 Cal.Rptr. 129, 724 P.2d 1154], defendant argues the court erred in characterizing the second degree burglary convictions as "residential," since at the time they were entered "residential burglary" was not a specific, discrete offense. *Jackson* and *Alfaro* established that in proving a prior conviction was a "serious felony" for the purpose of the five-year enhancement under sections 667 and 1192.7, the prosecution could not go beyond the record of conviction to prove some fact that was not an element of the crime. (*Alfaro, supra,* 42 Cal.3d at p. 636.) However, in *People v. Guerrero* (1988) 44 Cal.3d 343 [243 Cal.Rptr. 688, 748 P.2d 1150] we overruled *Jackson* and *Alfaro* and held that in determining the truth of a prior-conviction allegation for the purpose of section 667 enhancements, the trier of fact may look to the "entire record of the conviction." (*Id.,* at p. 355.) In the instant case the court had the file of defendant's burglary convictions before it when it took judicial notice of their residential nature. There was no error.

(d) *Prejudice.*

█ Defendant maintains that the error in admission of Commissioner Fletcher's testimony and his juvenile adjudications was prejudicial under *People v. Boyd, supra,* 38 Cal.3d 762, 775-776. We disagree. In addition to the erroneously admitted juvenile adjudications, the jury properly had before it evidence of defendant's commission of an attempted robbery at the age of 15, 2 residential burglaries at the age of 18, and at age 19 the offenses charged in this case—murder in the course of robbery and 3 armed robberies, 1 with intentional infliction of great bodily injury. The jury also had before it the circumstances of the murder—a cold-blooded shooting of a defenseless 93-pound, 4-foot 11-inch elderly woman immediately after defendant twice shot in the face, at point-blank range, his third robbery victim. A witness testified defendant laughed afterward. Even without Commissioner Fletcher's testimony, from this evidence the jury would have had to infer that from an early age defendant had been engaged in a pattern of serious criminal activity, culminating in the present violent offenses, and

that he had failed to respond to the rehabilitative efforts of the criminal justice system.

In his closing argument, the prosecutor did not exploit the inadmissible evidence, but rather, made only passing reference to defendant's juvenile adjudications—his "juvenile record"—to support the thesis that despite his youth, defendant was an experienced criminal. "His prior juvenile record stands for that proposition," the prosecutor stated. "Can you imagine being sent to the state prison at age 18?" Because defendant's incarceration at age 18 was properly before the jury, as were his juvenile adjudication of attempted robbery, his 2 burglary convictions at age 18, and the present 4 offenses, the admissible evidence of itself compelled the conclusion he was an experienced criminal; any implied reference to the inadmissible juvenile adjudications could not have made a difference. (Cf., e.g., *People* v. *Boyde* (1988) 46 Cal.3d 212, 249-250 [250 Cal.Rptr. 83, 758 P.2d 25]; *People* v. *McLain* (1988) 46 Cal.3d 97, 110 [249 Cal.Rptr. 630, 757 P.2d 569].) On this record, given the properly admitted evidence of defendant's substantial criminal history and the circumstances of the instant offenses, there simply is no reasonable possibility the jury's penalty verdict was affected by the inadmissible evidence. *(People* v. *Brown* (1988) 46 Cal.3d 432, 449 [250 Cal.Rptr. 604, 758 P.2d 1135].)

2. *Instructions and Argument.*

(a) *Davenport Error.*

Relying on *People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861], defendant argues the court erred in instructing the jury on inapplicable mitigating factors. We have rejected this argument in *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250] and *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].

Defendant contends additionally the prosecutor erred in arguing the absence of particular mitigating factors constituted aggravation. With one exception, however, the record shows the prosecutor merely reviewed all the statutory factors and indicated to the jury which he believed were inapplicable, concluding on two occasions (lack of mental disease or intoxication [factor (f)] and lack of mental disturbance [factor (d)]) with the rhetorical question: "How does that weigh? Is that a factor . . . in aggravation or a factor in mitigation?" ■ The exception was factor (j), whether or not the defendant was an accomplice to the offense and his participation was relatively minor. The prosecutor observed that defendant was an accomplice with Otis Clements, but his participation was not relatively

minor; rather, defendant was the "mover and shaker" in the case; he was the gunman. "[H]ow does that weigh?" the prosecutor asked rhetorically; "I suggest and I suspect, aggravating."

Although in *Davenport* we held prosecutorial argument that the absence of a mitigating factor is a factor in aggravation "should not in the future be permitted" (41 Cal.3d at pp. 289-290), we did not rely on the point in reversing the penalty judgment. (See *People* v. *Boyde, supra,* 46 Cal.3d at p. 255.) Further, in *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 789-790, we held the prosecutor may properly argue the inapplicability of mitigating factors that, if present, would make the defendant less culpable. (See *People* v. *Ghent, supra,* 43 Cal.3d 739, 775.) Certainly defendant would have been less culpable if his participation had been minor. That he was the ringleader was a circumstance of the offense the prosecutor could properly have argued under factor (a), but did not. That he argued it instead under factor (j) was not prejudicial.

Insofar as the prosecutor's argument may have implied the absence of the other inapplicable mitigating factors should be considered aggravating, we conclude this, too, was nonprejudicial. Here, as in *Boyde, supra,* 46 Cal.3d 212, the trial took place before our *Davenport* opinion and the argument "occurred only once at the outset when the prosecutor went through the list of aggravating and mitigating factors in light of the evidence presented." (*Id.,* at p. 255.) The prosecutor prefaced his remarks with the statement he would discuss the factors, "if they apply and if they don't"; defense counsel argued the inapplicability of the factors; and the court instructed the jury to consider the factors "if applicable." The prosecutor did not count up factors in aggravation and ask the jury to weigh them numerically, nor did he otherwise mention the inapplicable factors in his argument. We find no reasonable possibility the jury was misled.

(b) *Defendant's Age.*

Defendant argues the prosecutor erred prejudicially in arguing defendant's age should not be weighed in his favor.[8] ██ As we recently held in *People* v. *Lucky, supra,* 45 Cal.3d 259, mere chronological age of itself should not be deemed an aggravating factor or a mitigating factor. Rather,

---

[8]The prosecutor stated: "Mr. Burton's age. He is 20 now. He was approaching 19. He was a month shy of 20 years old when he committed the murder of Mrs. Khwaja. He is a young man. Ordinarily I would suggest to you and I would suspect that youth ought to weigh in his favor, but then I turn it right around and I suggest to you that he was a young man 19 or 20, going on 30 or 40 in terms of his experience on the side of criminal activity in Los Angeles County. And his prior juvenile record stands for that proposition. Can you imagine being sent to the state prison at age 18?"

"the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*Id.,* at p. 302.) Pursuant to the analysis in *Lucky,* the prosecutor's comments were proper.

### (c) *Defendant's Background and Character Evidence.*

The trial court instructed the jury in terms of former CALJIC No. 8.84.1 factor (k) that in determining penalty it could consider "[a]ny other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime." At defendant's request, the court further instructed the jury as "factor (*l*)" that it could consider "[t]he defendant's character, background, history, mental condition and physical condition." During deliberations the jury sent the court a note stating it had "[q]uestions concerning interpretation of Point k." The court responded that "what we are talking about here is any circumstance which in your judgment lessens the gravity or seriousness of the crime, even if it is not a legal excuse for the crime. So when we talk about extenuate, we talk about lessening the gravity of the crime."

■ Defendant first argues that in failing to inform the jury that factor (k) should be read in conjunction with the added factor (*l*), the trial court, in its clarifying instruction, improperly placed all the emphasis on the circumstances of the offense, thus diverting the jury from weighing defendant's sympathetic background and character evidence that was unrelated to the offense. (See *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954]; *People* v. *Easley* (1983) 34 Cal.3d 858, 877-878 and fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) We reject this contention. The trial court responded to the jury's question; it was not required to do more. The court earlier had instructed the jury, pursuant to "factor (*l*)," to consider defendant's background and history and had instructed it to consider all the evidence, and both the prosecutor and defense counsel had argued defendant's background evidence at length. (Cf. *People* v. *Malone, supra,* 47 Cal.3d 1, 55.) There was no error.

■ In a closely related argument, defendant maintains the court's instructions and the prosecutor's arguments together improperly limited the jury's consideration of his mitigating background and character evidence (citing, e.g., *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669]; *Hitchock* v. *Dugger* (1987) 481 U.S. 393 [95 L.Ed.2d 347, 107 S.Ct. 1821]). In determining whether the sentencer was adequately informed of its responsibility to consider all the defendant's mitigating

evidence, we examine the instructions and arguments as a whole. (*People* v. *Lucky, supra,* 45 Cal.3d 259, 298.) Such an examination here persuades us the jury could not have been misled concerning the relevant scope of mitigating evidence. The court, as indicated, supplemented its factor (k) instruction with defendant's requested factor (*l*) instruction, which specifically directed the jury to consider defendant's background and character evidence; the prosecutor in his argument recognized the potential mitigating effect of defendant's evidence; defense counsel argued its mitigating effect at length. On this record, we conclude the jury cannot have been misled about its responsibility to consider all of defendant's proffered evidence. (See *People* v. *Lucky, supra,* at pp. 298-299; *People* v. *Ghent, supra,* 43 Cal.3d at pp. 777-778.)

(d) *Dual Use of Underlying Crimes.*

■ It is settled that factors (b) and (c) of section 190.3 pertain only to criminal activity other than the crimes for which the defendant was convicted in the present proceeding. (*People* v. *Malone, supra,* 47 Cal.3d at p. 45.) Defendant argues the court's instructions and the prosecutor's argument erroneously permitted the jury to consider the K-Mart robberies he was convicted of in this case as aggravating prior felony convictions under factor (c) and other criminal activity involving force under factor (b).

In his argument the prosecutor did not mention factor (c) per se, but in discussing factor (b), "the presence or absence of criminal activity," he stated there is no criminal activity "other than the priors we have alleged, the five of them, and our case itself." The prosecutor then reviewed defendant's criminal history, referring to "the prior felony convictions" of "attempted robbery, attempted grand theft from the person. And Judge Fagan will instruct you what some of these other crimes are. There are technical definitions. Lewd act with a child, burglary, residential burglary, and then finally . . . two counts of residential burglary . . . ." Concluding, the prosecutor stated: "And he gets out of prison on that residential burglary. And what does he do? He arms himself with a gun and we come full circle back to our case here." The prosecutor then discussed the circumstances of the Khwaja robbery and murder. At no point did he expressly mention the K-Mart robberies. Thereafter, as the prosecutor indicated it would, the trial court instructed the jury on the elements of the defendant's offenses "prior to the offense of murder in the first degree of which he has been found guilty in this case," to wit, the offenses of "burglary, attempted robbery, attempted grand theft from the person and committing a lewd act with a child."

On this record, we find no indication the jury would have understood the guilt phase K-Mart robberies came within factor (c). Indeed, there was no

mention of the K-Mart robberies at all. The prosecutor distinguished defendant's prior convictions from "our case itself," and the court's instructions concerning prior offenses reinforced the distinction.

Defendant argues the prosecutor's reference to "our case here," together with the court's instruction to consider "all of the evidence which has been received during any part of the trial of this case," led the jury to consider the K-Mart robberies as evidence of factor (b) other criminal activity. We are unpersuaded. At the conclusion of its instructions, the court instructed the jury to "consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed." As indicated, neither the court's instructions nor the prosecutor's argument referred to the K-Mart robberies as an aggravating factor. Even were we to assume otherwise, the reference could not have been prejudicial. The jury was fully aware of the K-Mart robberies; the prosecutor did not count aggravating factors or list them in opposition to mitigating factors, nor did he refer to the K-Mart robberies under any other factor, e.g., the circumstances of the offense. Any error was harmless.

(e) *Booth Error.*

 Relying on *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], defendant contends the prosecutor's argument to the jury to consider the impact of the murder on the victim's family was reversible error. Although *Booth* is factually distinguishable, we have recently acknowledged that arguments directing the jury's attention to the impact of the murder on the victims may be inappropriate under *Booth*. (*People* v. *Miranda, supra,* 44 Cal.3d at p. 113; *People* v. *Ghent, supra,* 43 Cal.3d at p. 771; compare *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767-768 [175 Cal.Rptr. 738, 631 P.2d 446] [evidence of future dangerousness inadmissible] with *People* v. *Davenport, supra,* 41 Cal.3d at p. 288 [argument concerning future dangerousness permissible].)

In the case at bench, the prosecutor stated that although the jury had met Mrs. Burton and knew something about her and something about defendant, "You know nothing about Mrs. Khwaja." He then observed the family "appears to be newcomers" to this country and stated, "imagine the hopes and desires and loves that have been destroyed . . . ." Although he did not know if there was a husband, the jury had seen one of her children and had "probably" seen other family members in the courtroom. He invited the jury to "put yourselves . . . in their position and imagine the loss."

The prosecutor's comments were made in the context of his recognition that Mrs. Burton "is in an awful position and I don't envy her position. She

loves her son. And . . . she doesn't want you to impose the death penalty. So you have a sympathetic figure there." His reference to Mrs. Khwaja's family was no more than an effort to balance the picture. Unlike *Booth* where the evidence specifically detailed the impact of the crime on particular members of the victim's family, the prosecutor's remarks here did no more than refer to the obvious and nonspecific fact that Mrs. Khwaja's murder would affect her family, just as defendant's death would affect his. Significantly, the prosecutor told the jury that the law permits no plea from the family, thereby suggesting the impact on the family was not a proper factor in aggravation. We conclude any error in the comments was harmless beyond a reasonable doubt. (*People* v. *Malone, supra,* 47 Cal.3d at p. 39; *People* v. *Miranda, supra,* 44 Cal.3d at p. 113; *People* v. *Ghent, supra,* 43 Cal.3d at p. 771.)

(f) *Brown Error.*

 Defendant contends the court's instruction, together with the prosecutor's argument, misled the jury regarding the scope of its sentencing responsibility and discretion.

The trial court instructed the jury on its sentencing responsibility in accordance with section 190.3 (former CALJIC No. 8.84.2).[9] In *People* v. *Brown* (1985) 40 Cal.3d 512, 540-544 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), we recognized that this instruction, given in isolation, had the potential for misleading the jury about the fundamental scope of its sentencing discretion. "Our concerns were twofold and interrelated: that a juror might understand his function as (i) merely the 'counting' of factors and then (ii) reaching an 'automatic' decision, with no exercise of personal responsibility for deciding, by his own standards, which penalty was appropriate. [Citation.]" (*People* v. *Milner* (1988) 45 Cal.3d 227, 256 [246 Cal.Rptr. 713, 753 P.2d 669]; see *People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115].) In cases such as this, decided before *Brown,* we examine the entire record "to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion . . . ." (*Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)

---

[9] The court stated: "After having heard all the evidence and after having heard and considered the argument of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death; however, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

In the instant case there is no question of jury confusion concerning its responsibility to weigh, rather than count, the applicable factors. The prosecutor informed the jury it was their responsibility to make findings of fact and "findings of gravity" as to certain factors—to determine the "seriousness or attenuation, mitigation" of the factors. Defense counsel emphasized the point, stating each individual juror decides how much weight to give a factor and one factor alone is sufficient for a finding that death is not the appropriate penalty. "You don't just add them up. . . . You have an awful lot of leeway . . . in weighing them."

Rather, defendant maintains the prosecutor's argument likely misled the jury to believe its responsibility was merely as factfinder, not as conscience of the community, and if, after weighing the factors, it found aggravating outweighed mitigating, it was required to return a sentence of death without regard to its view of the appropriateness of the penalty for defendant.

In support, defendant quotes from the prosecutor's closing argument, emphasizing his comments that if the jury finds the factors of aggravation outweigh those of mitigation, it "shall impose the death penalty. Now, not you may, not you might, not if you would like to, but you shall . . . ." As this court has stated, however, "it is not improper per se to instruct the jury that it 'shall' impose death." (*People* v. *Adcox* (1988) 47 Cal.3d 207, 268 [253 Cal.Rptr. 55, 763 P.2d 906] [prosecutor emphasized mandatory "shall" language, told the jurors to "follow the law" and said " 'you haven't any choice' "]; see *People* v. *Allen, supra,* 42 Cal.3d at p. 1279 [prosecutor argued, " '. . . *Shall, not may, not might, not maybe. It is very explicit. If the aggravating evidence outweighs the mitigating evidence you shall return a verdict of death*' " (Italics in original.)]; *People* v. *Hendricks* (1988) 44 Cal.3d 635, 653-655 [244 Cal.Rptr. 181, 749 P.2d 836] [prosecutor emphasized mandatory "shall" language and described the process as an "automatic" one]; *People* v. *Grant* (1988) 45 Cal.3d 829, 857 [248 Cal.Rptr. 444, 755 P.2d 894] [prosecutor suggested that if aggravating factors predominated, the law "requires" imposition of the death penalty and argued the jury's decision was "dictated by the law"].) The issue is whether in context the jury understood that, by weighing the various factors, it determined under the relevant evidence—under the facts—which penalty is appropriate in the particular case. (*People* v. *Brown, supra,* 40 Cal.3d 512, 541.)

Defendant suggests the jury was misled because of the prosecutor's reminder to them of their promise to "apply the law . . . follow the law. . . . [G]o where the law and the facts took you." That is what he would ask them to do: "to follow the law and follow it where it takes you. And if it takes you to a finding of the death penalty in this case, whether you like it or not, I am going to ask you to impose the death penalty." Later, after discussing the applicable factors, the prosecutor stated: "I think you are

going to find, whether you like or not," that the factors of aggravation "are going to lead you to impose the death penalty." In closing, he stated: "I expect you to do what the law requires you, whether you like it or not, whether you approve of it or not, because you told us you would."

These remarks, however, did not stand in isolation. Viewed in context, it is apparent that in reminding the jurors of their promise and urging them to "follow the law," the prosecutor was simply exhorting the jurors to abide by their oaths—to stand true to their assurances during voir dire that, regardless of their personal views concerning the death penalty, they could put such individual feelings aside and decide the penalty in this case based on the evidence and facts presented. The prosecutor reminded the jurors that during voir dire "nobody asked you really what your opinions were about the death penalty. . . . And you must wonder why . . . . Isn't it important for these lawyers to know just how I feel about the death penalty . . . ? [¶] The answer is: Well, maybe. But it really doesn't make any difference how you as individuals feel about the death penalty. And the reason it doesn't make any difference is you appear to be 12 people who are willing to apply the law. You told us you would. . . . You would go where the law and the facts took you." Continuing, the prosecutor stated: "And I guess that's what I am going to ask you to do. I am going to ask you to follow the law and follow it where it takes you."

In short, in urging the jurors, if the facts took them to the death penalty, to apply that penalty whether "you like it or not," the prosecutor was not urging them to disregard their personal views concerning the appropriateness of death *for defendant*; he was referring to their stated willingness—their oath—to decide the case on its facts, and not according to any preexisting bias they may have had for or against the death penalty, a bias they assured the court they could put aside. (See *People* v. *Allen, supra,* 42 Cal.3d at p. 1280; *People* v. *Boyde, supra,* 46 Cal.3d at pp. 253-255.) The whole thrust of his argument was that this was an appropriate case for the death penalty; if the jury agreed, they should go where that conclusion takes them—follow the law—and impose the death penalty.

From the very outset the tone of the prosecutor's argument was that the jurors had a heavy responsibility—"a burden"; they were the "conscience of the community"; they spoke "on behalf of the community . . . as to what the right thing to do in this case is." He stated that he was fallible—they all were; he didn't have all the answers, he merely had a point of view that he was going to present, and that point of view was to urge the jury to impose the death penalty on the defendant. "If, after everything is said and done, you folks get into the jury room and you come up with other thoughts and ideas other than what I suggest to you . . . , that is just fine and dandy. I am sure you will. [¶] In that spirit, let me begin."

After discussing application of the statutory factors, in closing the prosecutor said: "I expect you to do what the law requires you, whether you like it or not, whether you approve of it or not, because you told us you would. And you are going to have to be true to yourself. I expect you to do justice to [defendant] and to the community. . . . And [if] justice leads you to life imprisonment without the possibility of parole, then so be it, but it seems to me *the entire thrust, the weight, the gravity of this case,* the senselessness of the killing, the stupidity of the motive for the killing, the meanness of the way the killing was done by this defendant, with his background, *will lead you inexorably to the death penalty.* This is a death penalty case."

Defense counsel further emphasized the jury's responsibility. He informed the jury there were no guidelines on the weight to give any of the factors or which factor is more important—it was up to them—and that one factor is enough to decide death is not appropriate. He stressed that each juror had the responsibility to make an individual decision and that it is "a lot of responsibility . . . a tremendous responsibility . . . an awesome responsibility." Addressing defendant's youth, he informed the jury that "you can't put people to death at 18," and if they decided on the basis of defendant's age alone not to impose the death penalty, "you will be following the law. . . . And you promised to follow the law and I expect nothing else from you than to follow the law, . . ." Concluding, counsel emphasized this was not an appropriate case for the death penalty. "You can follow the law and save the executions for someone who deserves it more. Save it for the most exaggerated cases . . . the most serious cases. . . . [¶] I think, to have the death penalty mean something, . . . it should be saved for the right case . . . . And *this is just not one of those cases you ought to do it.*"

This is not a case like *People* v. *Milner, supra,* 45 Cal.3d 227, where the prosecutor "assured the jurors again and again that they did not have to 'shoulder the burden of personal responsibility,' told them again and again that the law 'protects' them from deciding what is 'just and right,' and even encouraged them to 'hide' behind the law." (*Id.,* at p. 257.) Nor is it like *People* v. *Farmer* (1989) 47 Cal.3d 888 [254 Cal.Rptr. 508, 765 P.2d 940] where a majority of this court found prejudicial error in the prosecutor's comments that " 'Whether or not Mr. Farmer should live or die was decided by the voters of this state when they passed this law, when they set the criteria. They decided who lives and who dies. You decide does aggravating outweigh mitigating? . . . That is all you decide. The law does the rest. . . . You do not decide life or death. The law does that.' " (*Id.,* at p. 928.) Rather, this case is virtually indistinguishable from *People* v. *Allen, supra,* 42 Cal.3d 1222, 1279-1280 and *People* v. *Boyde, supra,* 46 Cal.3d 212, 253-255, as well as *People* v. *Adcox, supra,* 47 Cal.3d 207, 267-268 and *People* v. *Hendricks, supra,* 44 Cal.3d 635, 653-655, where, in context of the entire record, this court found substantially similar prosecutorial argument

to be nonprejudicial. In *Hendricks,* for example, we held it was not prejudicial error for the prosecutor to explain that once the jury concluded the aggravating circumstances outweighed the mitigating ones, a death sentence was "automatic." "[W]e see no impropriety in a prosecutor urging that the jurors 'follow the law' and base their penalty decision on a weighing of the applicable factors, so long as it is understood that *inherent in the weighing process itself* is the determination of 'appropriateness' . . . ." (44 Cal.3d at p. 655, italics in original.) And, as we stated in *Boyde, supra,* "Obviously, when jurors are informed that they have discretion to assign whatever value they deem appropriate to the factors listed, *they necessarily understand they have discretion to determine the appropriate penalty.*" (46 Cal.3d at p. 253, italics added.)

On this record, we conclude no reasonable jury could have been misled as to its responsibility and discretion to determine, through the weighing process, whether death or life without possibility of parole was the appropriate punishment for defendant. (See *People* v. *Brown, supra,* 46 Cal.3d at p. 454.) Rather, from the arguments of both the prosecutor and defense counsel, the jury would have understood that by weighing the various factors, it determined, under the facts, which penalty was appropriate for defendant. (See *People* v. *Brown, supra,* 40 Cal.3d 512, 544 and fn. 17.)

3. *Proportionality Review.*

Defendant asks that we independently review the sentence for arbitrariness, discrimination and proportionality. The Eighth Amendment does not require us to perform intercase proportionality review (*Pulley* v. *Harris* (1984) 465 U.S. 37, 51-54 [79 L.Ed.2d 29, 40-43, 104 S.Ct. 871]) and we have consistently declined to undertake such review. (*People* v. *Babbitt, supra,* 45 Cal.3d 660, 725.)

Defendant also urges that under principles of equal protection, we must perform comparative sentence review equivalent to that provided by the Board of Prison Terms for felons sentenced to determinate terms. (§ 1170, subd. (f).) We rejected this argument in *People* v. *Allen, supra,* 42 Cal.3d at pages 1286-1288.

### Conclusion

The judgment is affirmed.

Lucas, C. J., Eagleson, J., and Arguelles, J.,* concurred.

**BROUSSARD, J.**—I concur in the judgment to the extent it affirms the guilt verdicts and special circumstance findings. I dissent, however, from

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

the majority's affirmance of the penalty judgment. Evidence was erroneously admitted which painted defendant as a depraved youth who had failed to profit from earlier efforts at rehabilitation. This error alone was prejudicial; the verdict is also undermined by the grave risk that the jury was misled as to its function and responsibility in determining penalty.

### 1. *Boyd Error*

I agree with the majority that the trial court erred in admitting the juvenile court commissioner's testimony regarding juvenile court practice, juvenile facilities, and defendant's prior juvenile adjudications. Apart from the evidence of the adjudication for attempted robbery, this evidence was inadmissible because it was not relevant to the statutory factors in aggravation. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782].) I part company with the majority on the question of prejudice. We have recognized that substantial prejudice is inherent in evidence of prior uncharged crimes. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 318 [165 Cal.Rptr. 289, 611 P.2d 883].) The commissioner's testimony showed that defendant had committed a lewd act on a child under the age of four, an offense which obviously was likely to prejudice the jury. It cannot be disputed that "evidence of sex crimes with young children is especially likely to inflame a jury." (*Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 138 [172 Cal.Rptr. 86], cited with approval in *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 452 [204 Cal.Rptr. 700, 683 P.2d 699].) Further, the inadmissible evidence showed that defendant had a lengthy, serious criminal record. The prosecutor used the extensive juvenile record to rebut the otherwise mitigating circumstance of defendant's youth at the time of the charged crimes. In addition, the prosecutor improperly asked the jury to draw the inference, based on the commissioner's inadmissible testimony about the rehabilitative service which had been made available to defendant, that defendant had been offered education and rehabilitation and had refused to reform. It is not only reasonably possible, but probable that these errors affected the verdict. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

### 2. *Brown Error*

The trial court instructed the jury to "consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a

sentence of confinement in the State Prison for life without the possibility of parole."

In *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], we upheld our death penalty law in the face of a claim that it unconstitutionally mandated the imposition of the death penalty whenever aggravating circumstances outweighed mitigating circumstances. We recognized that a capital sentencing jury must make an individualized determination whether, given the character of the defendant and the circumstances of the crime, death is the appropriate penalty. (40 Cal.3d at p. 540.) We also recognized that the jury is not simply a fact finder, but must make a moral determination whether the facts warrant the death penalty in the particular case. (*Ibid.*; see also *People* v. *Myers* (1987) 43 Cal.3d 250, 275-276 [233 Cal.Rptr. 264, 729 P.2d 698].) "Moreover, the decision is the responsibility of the jury and no one else. '[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' [Citation]." (*People* v. *Brown, supra,* 40 Cal.3d at p. 540, quoting *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 239, 105 S.Ct. 2633].)

We recognized in *Brown, supra,* 40 Cal.3d 512, that the instruction quoted above could seriously mislead the jury about the scope of its discretion and the method by which it should go about determining which penalty to impose. "Our concerns were twofold and interrelated: that a juror might understand his function as (i) merely the 'counting' of factors and then (ii) reaching an 'automatic' decision, with no exercise of personal responsibility for deciding, by his own standards, which penalty was appropriate." (*People* v. *Milner* (1988) 45 Cal.3d 227, 256 [246 Cal.Rptr. 713, 753 P.2d 669]; see also *People* v. *Allen* (1986) 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115].) We indicated that trial courts should in the future give clarifying instructions, but that in cases tried before *Brown,* we would examine the case "on its own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) We look to the record as a whole, but examine most carefully the arguments of the prosecutor to determine whether it has dispelled the ambiguity of the instruction. (See *People* v. *Guzman* (1988) 45 Cal.3d 915, 959-960 [248 Cal.Rptr. 467, 755 P.2d 917]; *People* v. *Milner, supra,* 45 Cal.3d 227, 254-258; *People* v. *Melton* (1988) 44 Cal.3d 713, 761-762 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Hendricks* (1988) 44 Cal.3d 635, 652-653 [244 Cal.Rptr. 181, 749 P.2d 836]; *People* v. *Howard* (1988) 44 Cal.3d 375, 435-436 [243 Cal.Rptr. 842, 749 P.2d 279]; *People* v. *Myers,*

*supra,* 43 Cal.3d 250, 275-276; *People* v. *Allen, supra,* 42 Cal.3d at pp. 1278-1280.)

The prosecutor's argument in this case exploited the ambiguity of the instruction, and sought to convince the jury to view itself as merely a fact finder, bound by the law to impose the death penalty if it found that aggravating factors outweighed mitigating factors. The district attorney did at one point ask the jury to do justice. However, unlike the majority, I find that the entire thrust of his argument was to persuade the jury that the law made the death penalty mandatory, and that it was the jury's duty to impose the death penalty whether it liked it or not.

The prosecutor described the jury's obligations under the 1978 death penalty law: "And just what is that statute? Well, what that statute does is it imposes on you, a jury, certain obligations. It permits you to make findings of fact, it permits you to make findings of gravity as to certain factors, and once you have made those—those findings of fact and/or seriousness or attenuation, mitigation, it tells you that if you find that, taking into consideration all of the factors that you will be advised of—*if you find that the factors of aggravation outweigh the factors of mitigation, you shall impose the death penalty. Now, not you may, not you might, not if you would like to, but you shall impose the death penalty.* [¶] And it further says that if you find that the factors of mitigation outweigh the factors of aggravation, you shall impose a penalty of life imprisonment without possibility of parole. *You shall. It is mandatory. You don't have any choice about the matter, once you make the findings of fact and of weight to be given to those findings of fact.*" (Italics added.)

The district attorney urged the jurors to remember their promise to follow the law. "You told us that you were 12 people who would follow the law. You would go where the law and the facts took you. . . . Combined with that willingness, whether you like it or not, that willingness to do a duty as difficult as that duty might be—combine that with *the requirement of the law imposing upon you a duty to impose or not to impose the death penalty, depending on what the facts are,* you will probably be able to live up to the standard that the—U.S. Supreme Court requires." (Italics added.)

The prosecutor then reviewed the evidence as to each factor in aggravation and mitigation, and concluded: "As you take all these factors and weigh them, I think you are going to find, *whether you like it or not,* that these factors of aggravation, circumstances of the crime, background of this young man are going to lead you to impose the death penalty." (Italics added.)

The prosecutor urged the jurors to follow the law where it took them, whether they liked it or not: "I am going to ask you to follow the law and follow it where it takes you. *And if it takes you to a finding of the death penalty in this case, whether you like it or not, I am going to ask you to impose the death penalty.* If it takes you to life imprisonment, whether you like it or not, I am going to ask you to impose life imprisonment without possibility of parole." (Italics added.)

As we explained in *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1037 [254 Cal.Rptr. 586, 766 P.2d 1], the jury's function at the penalty phase of a capital trial is a normative one. In cases tried before *Brown,* we examine the record for acknowledgement and explanation of this concept. (*Edelbacher* at p. 1037.) Here, the prosecutor repeatedly misled the jury as to its function. He urged the jury to function as a mere fact finder, and not as the conscience of the community. As in *Edelbacher,* he told the jurors just to weigh the factors, and that death was mandatory if the aggravating factors predominated. He told them that they would have to impose the death penalty, whether they liked it or not, by operation of the law which made the death penalty mandatory if aggravating factors predominated. He never explained how their duty to select the appropriate penalty fit into the calculus of aggravating and mitigating circumstances, but instead, as in *Milner, supra,* 45 Cal.3d 227, and *People* v. *Farmer* (1989) 47 Cal.3d 888, 928-929 [254 Cal.Rptr. 508, 765 P.2d 940], sought to persuade the jurors that the law, not the jury, was responsible for selecting the penalty to be imposed.

The court gave no special instruction which counteracted the false impression of the law given by the prosecutor that the jury's responsibility "was merely to weigh aggravating and mitigating factors without regard to its view of the appropriateness of the alternative penalties, and that it was 'required' to return a sentence of death if 'aggravation outweighed mitigation' without, or even despite, each juror's *personal* conclusion from the evidence, about whether a sentence of death was appropriate under the circumstances for the offense and offender." (*People* v. *Allen, supra,* 42 Cal.3d 1222, 1278 (italics in original); see also *People* v. *Milner, supra,* 45 Cal.3d at p. 257.)

This defendant, who was 19 at the time of the offenses charged in this case, presented significant mitigating evidence through his mother's testimony. He was one of eight children, raised in poverty, whose father was murdered when he was five years old. That the family or its circumstances blighted defendant is evident; five of the eight children ended up in trouble with the law. The jury was given to understand that the circumstances in aggravation were the evidence of the charged crimes, two adult burglary convictions, four juvenile court adjudications, and the testimony of the

juvenile court commissioner. The law prohibited the introduction of three of the four juvenile court findings, including the most inflammatory —defendant's commission of a lewd act on a child under the age of four. The juvenile court commissioner's testimony regarding the opportunities the juvenile justice system had provided for education and reform was likewise irrelevant, but it surely tended to discredit defendant and diminish the impact of his mitigating evidence. The erroneously admitted evidence added prejudicial weight to the case in aggravation.

We add to this the grave risk that the jury misunderstood what use to make of the mitigating and aggravating evidence before it. It may have examined the inflated aggravating evidence and concluded that since the aggravating factors outweighed the mitigating factors, death was mandatory without regard to the appropriateness of the penalty. Since the jury was clearly misled as to its function and responsibilities in making the grave decision entrusted to it, I would reverse the penalty judgment.

Mosk, J., and Carr (Frances N.), J.,* concurred.

Appellant's petition for a rehearing was denied July 27, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

* Associate Justice, Court of Appeal, Third Appellate District, assigned by the Chairperson of the Judicial Council.