IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 3, 2002

## STATE OF TENNESSEE v. MICHAEL LEWIS

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 7127     Joseph H. Walker, Judge**

---

**No. W2001-03121-CCA-R3-CD  - Filed March 26, 2003**

---

A Lauderdale County jury convicted the defendant, Michael Lewis, of reckless aggravated assault. On appeal, the defendant contends (1) the evidence was insufficient to support the conviction; (2) the trial court erred in conducting an *ex parte* hearing outside the presence of the defendant and his attorney; (3) the trial court erred in permitting a witness to testify to statements made by the co-defendant; (4) the trial court erred in refusing to admit into evidence a letter allegedly written by the victim; and (5) the trial court erred in permitting the defendant to represent himself. Upon reviewing the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. THOMAS T. WOODALL, J., not participating.

Gary F. Antrican, District Public Defender (at trial and on appeal); and Michael Lewis, *Pro Se* (at trial), for the appellant, Michael Lewis.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey Anne Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant and the victim were inmates at West Tennessee State Penitentiary. Unit Six is the maximum security unit, which contains four "pods" or housing areas. Inmates in maximum security who do not have jobs are required to remain in their cells twenty-three hours a day and are prohibited from contacting other inmates. When an inmate is out of his cell, he must wear leg restraints and handcuffs.

Kevin McWilliams was a co-defendant and former correctional officer at the prison who pled guilty to charges arising from these events. He testified that on December 15, 2000, co-defendant

William Lynn Webb, who was tried along with the defendant, requested McWilliams' presence at B-Pod. When he arrived, Webb asked him if he had experienced problems with two inmates arguing, and McWilliams did not respond. Donald Phillips, the victim, returned to B-Pod where his cell was located from the laundry room where he had been working. McWilliams stated that Webb instructed him to remove Phillips' restraints and to retrieve the defendant from his cell. Webb told McWilliams he wanted to put the two inmates together because he was tired of hearing them argue.

McWilliams testified that upon removing Phillips' restraints, he had Phillips strip down to his boxer shorts and socks. He stated he did not observe a weapon on Phillips. Phillips then entered a room, and McWilliams went upstairs to retrieve the defendant from his cell. McWilliams stated he searched the defendant visually and rectally and was "pretty sure" the defendant did not have a weapon.

McWilliams then permitted the defendant to exit his cell without wearing restraints. McWilliams testified the defendant walked to the edge of the stairs, ran down the stairs and into the room where Phillips was located, and slammed the door. The defendant and Phillips then began fighting. Phillips began bleeding and yelled that the defendant had a "shank." McWilliams stated he and Webb entered the room and separated the inmates.

McWilliams testified he and Webb escorted Phillips to the prison nurse for treatment. McWilliams stated he observed injuries to Phillips' back and head. He further stated Phillips was bleeding badly from an injury to his back and opined Phillips' injuries were caused by a shank, a homemade knife. McWilliams stated that although he never saw a weapon, a shank can be hidden in the palm of a hand or in a person's hair.

McWilliams testified Webb prepared a statement, which they both signed. According to the statement, Phillips was injured when he fell down the stairs. McWilliams stated Webb informed him that if they stated Phillips fell down the stairs, they would not be punished. Webb also instructed Phillips to tell the nurse he fell down the stairs, and Phillips complied. McWilliams testified that although both inmates agreed to a fist fight, Phillips never agreed to being attacked by a shank.

Carolyn Tatum, the personnel manager at the prison, testified Webb told her that the two inmates argued for the majority of the day, and that McWilliams wanted to allow the two inmates to fight. Webb told her that he escorted one inmate to a room, while McWilliams escorted the other inmate. Tatum stated Webb informed her that during the fight, one inmate produced a shank, which the officers did not know he had, and stabbed the other inmate several times. She testified that when she asked Webb what he had done with the shank, he replied, "Well, don't worry. It's not in the building."

Kathy Privett, an LPN at the prison, testified that on December 15th, between 5:30 p.m. and 6:00 p.m., an officer informed her someone had been injured. She stated she examined Phillips, who was bleeding "rather profusely" from his back. Nurse Privett stated she prepared an incident traumatic injury report, in which she indicated that Phillips had a small, semicircular cut on his neck,

several cuts on his back, a cut on his arm, and a cut on his head. One of the cuts on Phillips' back was approximately one centimeter deep with skin and flesh missing. Nurse Privett testified Phillips informed her that he fell down the stairs; however, he showed no signs of bruising. Phillips was then sent to a hospital and returned to the prison later that night.

Cheryl Manns, the custodian of medical records at Lauderdale County Baptist Memorial Hospital, testified Phillips had cuts on his right shoulder, his neck, and his left shoulder blade, and a wound on his back, which required staples.

Frederick Zonge, an inmate, testified that his cell was located in Unit Six. While Phillips, who worked in the laundry room, was passing bags of laundry to each cell, the defendant discovered Phillips did not fold his clothes. Zonge stated that in the penitentiary inmates who want their clothes folded must give the laundry worker "a little something" in order for him to fold them. The defendant was angered by the fact that Phillips folded Zonge's clothes, but did not fold his clothes. Zonge stated the defendant believed this to be a racial issue because Phillips was an "Aryan want-to-be," who claimed to be affiliated with the White Aryan Resistance.

Zonge testified Phillips and the defendant argued and cursed at each other. Phillips then challenged the defendant to a fight, and the defendant agreed. The defendant told Phillips to persuade Webb to allow them to "fight it out." When Zonge asked Webb if he would permit the inmates to fight, Webb stated he would likely allow it. A short time later, Zonge observed Webb strip search Phillips, and Zonge did not observe a weapon in Phillips' possession. After searching Phillips, Webb yelled at McWilliams, who was standing near the defendant's cell, that he did not find anything. McWilliams replied, "I've got it covered," and opened the defendant's cell door. Zonge testified the defendant ran down the stairs and into the room before Webb had a chance to stop him. The defendant closed the door; he and Phillips fought; and during the fight, Phillips began bleeding "like a stuck hog." Zonge stated that upon viewing the blood, Webb yelled, "He's got a knife," entered the room, and broke up the fight.

Zonge testified that when he later inquired about the shank, Webb told him the shank was a razor blade placed inside a piece of a plastic knife. Zonge further stated that when he questioned the defendant about the shank, the defendant stated McWilliams saw him hide the shank in the palm of his hand. Zonge admitted he later told a man claiming to be an Internal Affairs officer that he saw Phillips fall down the stairs, but explained that he made the statement because he did not like the manner in which the interview was being conducted.

Russell Wellington, an inmate, testified that he observed Webb strip search Phillips. He stated that after the search was completed, McWilliams opened the defendant's cell door and allowed him to exit his cell without restraints. The defendant then walked down the stairs passing Webb, and headed toward the room where Phillips was located. Wellington testified he could not view the room from his cell, but that he could see the stairs. He stated he never saw Phillips fall down the stairs. Wellington testified that after the altercation, he observed Webb holding a weapon in his hand, removing it from the area, and cursing because someone had possessed it.

Donald Phillips, the victim, testified that on December 15th, the defendant became angry at him because he did not fold the defendant's clothes. The defendant cursed Phillips and, upon calling McWilliams to his cell, the defendant requested the officer inform Webb that they wanted to fight. Phillips testified he observed the defendant reach into his hair as he was walking down the stairs prior to the fight. Phillips stated he agreed to a fist fight with the defendant, but that he never agreed to being attacked with a weapon. He further stated that during the fight, the defendant "stuck" him with a shank. Phillips testified that after the fight, Webb told him not to "snitch" on him, so he told the nurse he fell down the stairs.

Co-defendant William Lynn Webb testified that on December 15th, at approximately 5:15 p.m., Webb was preparing to accompany Phillips to his cell after Phillips had completed his work in the laundry room. After requesting assistance from McWilliams, Webb placed restraints on Phillips and escorted him out of the laundry room toward B-Pod where his cell was located. Webb stated he was carrying two to three bags of laundry; Phillips was carrying four to five bags of laundry; and McWilliams was walking in front of them. When they reached the top of the stairs, Phillips stumbled and began falling backwards. Webb testified that before he had time to steady the inmate, Phillips fell backwards and rolled to the bottom of the steps. Webb stated Phillips sustained cuts to his back and shoulder blades as a result of falling down the metal-grate steps. Webb denied instructing McWilliams to lie to the officers and denied stating to Tatum he put two inmates together to fight.

The defendant did not testify at trial. The jury convicted the defendant of reckless aggravated assault and acquitted him of intentional or knowing aggravated assault.[1] The trial court sentenced him to six years incarceration as a multiple offender.

## I. SUFFICIENCY

The defendant contends the evidence presented at trial was insufficient to support his conviction for reckless aggravated assault. We disagree.

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A jury verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). Accordingly, it is the appellate court's duty to affirm the conviction if the evidence, viewed under these standards, was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).

As applicable to the case at bar, a person commits reckless aggravated assault when he or she recklessly commits an assault and "[u]ses or displays a deadly weapon." Tenn. Code Ann. § 39-13-

---

[1] The jury found co-defendant Webb guilty of reckless aggravated assault and official misconduct.

102(a)(2)(B). A person, who "[i]ntentionally, knowingly or recklessly causes bodily injury to another," commits an "assault." *Id.* § 39-13-101(a)(1). A "deadly weapon" includes "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or . . . [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5).

When viewed in a light most favorable to the state, the evidence reflects that Phillips and the defendant agreed to engage in a fist fight. However, during the fight, the defendant produced a "shank" and repeatedly stabbed Phillips with it. Phillips testified that prior to the fight, he observed the defendant reach into his hair, and during the fight, he felt the shank as the defendant stabbed him with it. Wellington stated he observed Webb in possession of a weapon after the fight. The evidence also established Phillips suffered bodily injury as a result of the defendant's use of the shank. Phillips sustained various cuts on his shoulders and back. We conclude the evidence was sufficient to support the defendant's conviction for reckless aggravated assault through the use or display of a deadly weapon.

## II. *EX PARTE* PROCEEDINGS

The defendant contends the trial court conducted trial proceedings during which neither he nor his attorney was present. He maintains that by holding these proceedings, the trial court violated his constitutional right to be present during his trial and, therefore, erred in denying his motion for mistrial.

At the conclusion of the first day of trial after the jury was dismissed, the trial court conducted a jury-out hearing and overruled objections made by both the defendant and co-defendant Webb regarding Zonge's testimony. The defendant contends that after the trial court ruled on the objections, he was taken from the courtroom, followed by defense counsel.

The co-defendant and the state then conducted a voir dire examination of Tim Terry, the administrative assistant over inmate records, who was unable to be present at trial the following day. Terry testified he had a copy of Phillips' inmate disciplinary records and was custodian of the records. The trial court found Terry's presence was not required if co-defendant Webb introduced the records into evidence at trial. The parties then had a brief discussion concerning a juror who was allegedly acquainted with co-defendant Webb. The trial court decided to conduct a hearing on the issue the following day.

The next morning, defense counsel moved for a mistrial because the proceedings were held in his and the defendant's absence. The trial judge stated he thought the defendant and defense counsel were present during the proceedings. He then explained the events which occurred during the proceedings and denied the defendant's motion for mistrial.

The determination of whether to grant a mistrial rests within the sound discretion of the trial court. State v. Smith, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn

that decision absent an abuse of discretion. State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002). The burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). No abstract formula should be mechanically applied in making this determination, and all circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993).

Under both the federal and state constitutions, a defendant has a right to be present during his or her trial. *See* State v. Muse, 967 S.W.2d 764, 766 (Tenn. 1998). In addition, Rule 43(a) of the Tennessee Rules of Criminal Procedure provides that the defendant has the right to be present "at every stage of the trial including the impaneling of the jury and the return of the verdict." "Presence" at trial connotes that the defendant must be "present in court from the beginning of the impaneling of the jury until the reception of the verdict and the discharge of the jury." Muse, 967 S.W.2d at 766 (citations omitted). However, the defendant may waive this right through voluntary absence after commencement of the trial or through in-court misbehavior. Tenn. R. Crim. P. 43(b); Muse, 967 S.W.2d at 767; State v. Ballard, 21 S.W.3d 258, 260-61 (Tenn. Crim. App. 2000).

We are unable to determine from the trial record whether the defendant and defense counsel were absent during the proceedings. The first indication on the record of their absence occurred when defense counsel, while requesting a mistrial, declared he and the defendant were not present during the proceedings. The trial judge stated he thought they were in fact present during the proceedings. The trial court made no finding of fact as to whether the defendant and defense counsel were absent.

Regardless, we conclude the defendant is not entitled to relief. Some constitutional rights are so basic that their infraction cannot be harmless. State v. Bobo, 814 S.W.2d 353, 357 (Tenn. 1991). However, the constitutional right to be present at trial extends to a proceeding "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." United States v. Gagnon, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985); *see* Muse, 967 S.W.2d at 766.

In Muse, the Tennessee Supreme Court concluded a defendant's absence from the entire jury selection process required automatic reversal. 967 S.W.2d at 768. The court further noted that in federal cases where a defendant's absence from the jury selection process had been deemed harmless, the defendant was absent from only a small portion of the process. *Id.* (citations omitted). In addition, this court has held that a defendant's absence from the entire jury trial without a valid waiver also required automatic reversal. Ballard, 21 S.W.3d at 262.

Unlike the defendants in Muse and Ballard, the defendant in the case at bar was allegedly absent from only a small portion of the trial during a jury-out hearing. The defendant's ability to conduct a voir dire examination of Terry regarding authentication of Phillips' disciplinary records did not prejudice the defendant; the records were never introduced before the jury. Further, Phillips conceded his disciplinary records reflected two prior incidents of self-mutilation. As to the juror, there was only a mention of the state's concern that the juror might have knowledge of the event.

No hearing was conducted; the defendant was not prejudiced. We conclude the defendant's absence during this time did not result in prejudice to the defendant nor prejudice to the judicial process. Further, if there were a constitutional violation, it was harmless beyond a reasonable doubt.

### III. HEARSAY EVIDENCE

The defendant next contends the trial court erred in permitting the state to introduce inadmissible hearsay evidence at trial. Carolyn Tatum, the personnel manager at the prison, testified co-defendant Webb met with her regarding the incident. The prosecutor then attempted to question her regarding statements co-defendant Webb made about the incident, and defense counsel objected to the testimony as inadmissible hearsay. After the parties conducted a voir dire examination of Tatum during a jury-out hearing, the trial court gave the jury the following limiting instruction:

> As the State asked questions, the Attorney General asked this witness if one of the defendants had made a statement to her. The statement of a defendant can be used against that defendant. However, if there is information in that statement by one defendant, it cannot be used against the other defendant. . . .
> So a person can make an admission, which is an acknowledgment by a defendant of certain facts which tend, together with other facts, to establish that person's guilt. It has to be corroborated by other independent evidence to warrant and support a conviction.
> So the testimony of this witness as to one of the defendants, if you find that her testimony is that one of the defendants made a statement to her, then you have to judge the credibility of that statement, whether the statement was, in fact, made, and the truthfulness of the statement that that defendant made.
> And that statement or admission can be used against that particular defendant. However, it cannot be used against a co-defendant in a situation where the two are tried together.

Tatum then testified co-defendant Webb stated that the two inmates had been arguing throughout the day. McWilliams had grown tired of the bickering and wanted to allow the inmates to "fight it out." Webb told Tatum that he accompanied "his inmate" to a room without restraints, and then McWilliams escorted "his inmate" to the room. During the fight, "one of them had a shank" and stabbed "the other inmate" several times. Webb further stated he and McWilliams did not know the inmate possessed the shank. Tatum also testified that Webb was upset that McWilliams was not also placed on administrative leave "because the shank was found on the inmate that McWilliams - - " At that point, Tatum was interrupted with another question. Nevertheless, Tatum also stated Webb did not make any statements to her regarding the search of his inmate.

"Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Tatum's testimony regarding co-defendant Webb's statements implicated the defendant, although the defendant's name was not actually mentioned. Furthermore, the statements were

offered at trial for the truth of the matters asserted, that two inmates engaged in a fight and one had a shank. Therefore, Tatum's testimony regarding co-defendant Webb's statements was hearsay. Of course, the statements were properly admitted against co-defendant Webb under the party-opponent admission exception to the hearsay rule. *See* Tenn. R. Evid. 803(1.2).

The trial court instructed the jury not to consider Tatum's testimony against the defendant, thus, in theory, making her testimony inapplicable to the defendant. A jury is presumed to follow the instructions of the trial court. State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). However, we note that the adequacy of the limiting instruction under these circumstances calls for a closer examination. *See* Cruz v. New York, 481 U.S. 186, 193, 107 S. Ct. 1714, 95 L. Ed. 2d 162 (1987) (holding that where a nontestifying co-defendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission in a joint trial, despite a curative jury instruction); Bruton v. United States, 391 U.S. 123, 137, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) (holding the same).

However, unlike the issues encountered in Cruz and Bruton, the parties in the case at bar had the opportunity not only to fully cross-examine Tatum, the person who heard the statements, but also co-defendant Webb, the declarant, who also testified at trial. Thus the Cruz and Bruton confrontation issue is not implicated. Co-defendant Webb denied making the statements to Tatum. In light of the explicit limiting jury instruction coupled with the strong evidence of guilt, the defendant was not prejudiced by the admission of the statements at trial.

## IV. THE VICTIM'S LETTER

The defendant contends the trial court erred in refusing to admit into evidence a letter written by the victim. During his cross-examination of Phillips, the defendant, representing himself, produced a letter which Phillips had allegedly written to him the day before the incident occurred. The letter purportedly reflected Phillips' involvement with the White Aryan Resistance. The letter used the words "my 'family' W.A.R." Phillips testified he recognized the letter, but denied writing it. He further stated the handwriting in the letter was not his. Phillips also denied any affiliation with a hate group. The trial court sustained the state's objection to introducing the letter on the ground of irrelevance.

During the defense's proof, the defendant recalled Russell Wellington, who testified he had previously communicated with Phillips through letters. The defendant then showed Wellington the letter, and Wellington stated he recognized the handwriting as belonging to Phillips. The defendant requested Wellington read a line from the letter mentioning Phillips' involvement with the White Aryan Resistance. The state offered a general objection, and the trial court sustained the objection. The defendant then requested the letter be admitted into evidence, and the trial court stated it could be marked only for identification purposes.

We first note that this issue is waived as the defendant has failed to cite authority to support his argument. Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997). Regardless, we conclude the defendant suffered no prejudice.

To properly analyze the issue of prejudice, certain background information is necessary. It appeared to be the original defense theory that no fight occurred and Phillips had fallen down the stairs. During the trial, the defendant asserted his right of self-representation, which will be more fully discussed hereafter. When the defendant assumed *pro se* representation, it is apparent the tenor of the defense changed drastically. The defendant, *pro se*, cross-examined Phillips. It can be described as two inmates hurling varied and numerous accusations at each other. The defendant repeatedly accused Phillips of being in the White Aryan Resistance, which Phillips denied. The defendant became irate, and the following interchange occurred:

[Defendant]   I see that you're pretty aggressive. Is this the manner that you usually are?

[Phillips]   I'm upset because the person who stuck me is sitting right there lying to my face.

[Defendant]   I'm upset because I've got some white supremacist sitting up there on the motherf---ing stand, talking about I stuck him with a knife, when he knew he had the motherf---er, and you've got a racist-ass prosecutor sitting here upholding this shit, and you've got a judge sitting up here allowing you to stand up there telling this shit. You know damned well you brought that motherf---ing knife in that room.

[The Court]   Mr. Lewis --

[Defendant]   You know that.

[The Court]   Mr. Lewis --

[Defendant]   I took that motherf---er from you, and I used it on your motherf---ing ass.

The racial issue also arose during the testimony of Fred Zonge. Zonge testified that Phillips was an "Aryan want-to-be" and later stated Phillips "claims to be affiliated with the White Aryan Resistance."

We agree with the defendant's contention that the letter was proper impeaching evidence. However, in light of the entire record, we conclude the admission of the letter would not have affected the results of the trial. *See* Tenn. R. App. P. 36(b).

-9-

# V. *PRO SE* REPRESENTATION

The defendant next contends the trial court erred by allowing him to represent himself. He submits that he did not execute a written waiver of his right to counsel and that the oral waiver was not knowingly and intelligently made. We disagree.

## A. Hearing on Motion for Self-Representation

On the second day of trial, the defendant requested that the trial court remove defense counsel and permit him to represent himself through the remainder of trial. The defendant emphatically stated he was not receiving a fair trial, and he believed the only means by which he could reveal his version of the events to the jury was to represent himself.

The record reflects that for approximately eight pages of the transcript, the trial court questioned the defendant extensively regarding his request. Although the defendant acknowledged he had no prior experience representing himself, he stated he believed self-representation would be more effective at that point in the trial than the representation of defense counsel. The defendant stated he had not researched any of the issues presented at trial. The trial court informed the defendant that he would be required to comply with the rules of evidence and procedure, and that the court would base its decisions on the rules. The defendant replied that he was not concerned with the rules because he felt he was not receiving a fair trial. He further stated his lack of knowledge of the law was not important to him because "[t]he truth is the only thing that's pertinent right now."

The defendant stated he was aware of the charged offenses and realized he could be further incarcerated if convicted of the charges. The trial court informed him that it could not advise him in any way during the trial. The trial court further explained to the defendant the purposes of the Tennessee Rules of Evidence and Rules of Criminal Procedure and again informed him that, although the defendant was unfamiliar with the rules, he was still required to abide by them. The trial court then informed the defendant that if he chose to testify, he would be required to proceed in a question and answer format. The defendant indicated he understood this information.

The trial court opined defense counsel could more effectively represent the defendant at trial and that it was "unwise" for the defendant to attempt to represent himself. The trial court advised the defendant he should allow defense counsel to continue to represent him. The defendant stated that in spite of the possibility of further incarceration if convicted and the difficulties of self-representation, he still desired to waive his right to counsel and represent himself for the remainder of trial. The trial court found the defendant knowingly and voluntarily waived his right to counsel and permitted him to represent himself for the remainder of trial. The trial court further requested defense counsel remain throughout the trial as "standby counsel" in order to assist the defendant and possibly replace him, if the court no longer allowed the defendant to represent himself.

**B. Waiver of Right to Counsel**

Both the Tennessee and the United States constitutions grant a defendant the right to assistance of counsel in the preparation and presentation of a defense to a criminal charge. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In addition, the Sixth Amendment implicitly provides a defendant the right of self-representation. Faretta v. California, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); State v. Northington, 667 S.W.2d 57, 60 (Tenn. 1984). In order to activate the right of self-representation, the defendant must (1) timely assert the right to proceed *pro se*; (2) clearly and unequivocally exercise the right; and (3) knowingly and intelligently waive his or her right to assistance of counsel. State v. Herrod, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988). The defendant maintains the third condition was not met.

Generally, a defendant must assert the right of self-representation prior to jury selection to be considered timely. *See id.* at 629. In the case at bar, the defendant asserted the right on the second day of trial. This jurisdiction has not expressly addressed the standard by which we are to review a trial court's granting of a request to proceed *pro se* made after trial has commenced. However, this court has previously noted that the granting of a defendant's possibly untimely request to proceed *pro se* was a matter within the discretion of the trial court. *See* State v. Vincent Hatch, No. W2000-01005-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 849, at *13 (Tenn. Crim. App. Oct. 19, 2001, at Jackson), *perm. to app. denied* (Tenn. 2002). Furthermore, other jurisdictions have held that if a request for self-representation is made during trial, the right to proceed *pro se* rests within the discretion of the trial court. *See, e.g.,* State v. Vermillion, 112 Wn. App. 844, 51 P.3d 188, 194 (2002); State v. Collins, 257 Kan. 408, 893 P.2d 217, 221 (1995); People v. Burton, 48 Cal. 3d 843, 771 P.2d 1270, 1275 (1989). We agree with these holdings and conclude that in the case at bar, the trial court's decision regarding the timeliness of the defendant's request to represent himself was a matter of discretion.

In determining whether a defendant intelligently and knowingly waived his right to counsel, the trial court must question the defendant extensively regarding his ability to represent himself. Northington, 667 S.W.2d at 61; Herrod, 754 S.W.2d at 630. A defendant need not have "technical legal knowledge" in order to exercise his right of self-representation. Faretta, 422 U.S. at 836. This court has previously recommended trial courts follow the guidelines contained in *1 Bench Book for the United States District Judges* § 1.02-2 to -5 (3d ed. 1986), also contained in the appendix to United States v. McDowell, 814 F.2d 245, 251-52 (6th Cir. 1987). Herrod, 754 S.W.2d at 630.

In the case at bar, the trial court substantially complied with the format suggested in Herrod. The trial judge questioned the defendant extensively regarding his ability to represent himself. It advised the defendant against proceeding *pro se* and informed him that he would be required to comply with the rules of evidence and procedure. The trial court then designated defense counsel

as standby counsel in order to assist the defendant.[2]  Yet, the defendant was steadfastly determined to represent himself in spite of any and all admonitions of the trial court.  That was his right.  We conclude the defendant's waiver of the right to counsel was knowingly and intelligently made.

The defendant next contends his behavior at trial reflects that he did not fully understand the meaning of self-representation.  During the trial, the defendant lost his temper, and the trial court held him in contempt for his actions.  However, we may not consider a defendant's *pro se* trial performance in determining whether the defendant knowingly and intelligently waived his right to assistance of counsel.  Northington, 667 S.W.2d at 61-62.

Finally, the defendant submits his waiver was invalid because the trial court failed to secure a written waiver.  Rule 44(a) of the Tennessee Rules of Criminal Procedure provides that before a trial court may allow an indigent defendant to proceed *pro se*, it must require the defendant to execute a written waiver.  However, the failure to execute a written waiver does not necessarily invalidate an otherwise constitutionally valid waiver.  *See* Vincent Hatch, 2001 Tenn. Crim. App. LEXIS 849, at **17-18 (citations omitted).  In light of the trial court's extensive questioning of the defendant establishing that he knowingly and intelligently waived his right to assistance of counsel, any error with regard to noncompliance with the writing requirement is harmless.  *See* Tenn. R. App. P. 36(b).  Therefore, we conclude the trial court properly granted the defendant's motion to proceed *pro se* through the remainder of the trial.

## VI.  CONCLUSION

In summary, we conclude the evidence was sufficient to support the defendant's conviction for reckless aggravated assault and further conclude there is no reversible error with regard to the other issues raised by the defendant.  Therefore, we affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE

---

[2] "Standby counsel" is defined as "counsel who is not actively participating in the trial but is available to step in and take over as counsel if called upon to do so by either the defendant or the trial court." State v. Small, 988 S.W.2d 671, 672 n.1 (Tenn. 1999).  The appointment of advisory counsel is entirely within the trial court's discretion. *Id.* at 672.