Filed 6/30/21  P. v. Ortiz CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076579 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD279882) |
| RAFAEL GUTIERREZ ORTIZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed in part; reversed in part with instructions.

Alex Kreit, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

A jury in August 2019 found defendant Rafael Gutierrez Ortiz guilty of selling a controlled substance (methamphetamine) (Health & Saf. Code, §11379, subd. (a)); and found true the prison priors (Pen. Code,[1] § 677.5, subd. (b)).  The court sentenced defendant to nine years in prison, the midterm of six years for the drug sales and one year each for three of the prison priors.

On appeal, defendant contends the court erred by not construing his request to self-represent as a motion to substitute counsel and sua sponte conducting a *Marsden*[2] hearing.  He also contends, and the People agree, his three prison priors should be stricken under newly amended section 667.5.  Finally, he contends the court erred in imposing various fines, fees, and assessments without first considering his ability to pay.

As we explain, we agree defendant's three prison priors should be stricken.  Because we remand the cause for resentencing, we also decline under the unique facts of this case to decide whether the court erred in imposing the fines, fees, and assessments without first deciding defendant's ability to pay, instead finding defendant may raise that issue at resentencing.  In all other respects, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

William Neal of the San Diego Police Department testified he was working undercover in the East Village area of downtown San Diego on July 11, 2018.  Officer Neal was in an area known for narcotic-related activity, and had personally made about 25 to 50 arrests in the area.  Dressed in plain clothes and wired with a microphone, Officer Neal approached a

---

[1]    Unless otherwise noted, any further reference to sections is to the Penal Code.

[2]    *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

2

Hispanic male adult, later identified as defendant, and asked if he knew where he could get some "white," which was "street slang" for methamphetamine. In response to how much he wanted, Officer Neal said a "dub," which was slang for $20 of the drug.

Officer Neal watched the Hispanic male leave and approach another male adult down the street. Officer Neal attempted to get near the two men to hear their conversation. When the officer was about five feet away, one of the men put his hand up and said to wait. Officer Neal walked away. Less than a minute later, defendant returned and told the officer he was going to get the narcotic. Officer Neal observed defendant walk about 50 feet down the street and approach another male adult who was later identified as James Brunson.

The officer, who was about 40 feet away, observed defendant and Brunson "exchanging things" as Brunson was taking items out of his backpack and placing them onto a concrete wall. Based on his training and experience, Officer Neal believed Brunson handed defendant narcotics as he saw Brunson place something in defendant's hand, who immediately closed his fist.

Defendant next approached the officer and said, "Got 20?" Officer Neal placed in defendant's hand a "prerecorded" $20 bill, serial number ML919316358. Defendant in response placed a baggie containing a "small chunk of a clear crystal like substance" in the officer's hand. This substance was later determined to be .22 grams of methamphetamine. The conversation between Officer Neal and defendant was surreptitiously recorded via wiretap, a portion of which was played for the jury.

Joshua Leiber of the San Diego Police Department testified he was assisting in the "buy-bust" operation on July 11. Officer Leiber was the "scoop officer" in the operation, which meant he waited until the detective monitoring Officer Neal gave the "bust signal." Officer Leiber received word of a narcotics transaction, was given a description of the suspect involved in the sale, and promptly drove his police cruiser to the location and identified a male riding a bicycle matching that description. The suspect was later identified as Brunson.

Officer Neal confirmed that Brunson was one of the subjects involved in the narcotic transaction. Officer Leiber searched Brunson and found in his front left pocket a clear Ziploc baggie with a crystalline substance inside; $145 in his front breast pocket; and a black, tarlike substance in his backpack that Officer Leiber believed was heroin. Subsequent testing confirmed the crystalline substance was 3.27 grams of methamphetamine; and the tarlike substance was .63 grams of heroin.

Sergeant Joel Tien of the San Diego Police Department was also working with Officer Neal and the crime suppression team on July 11. Located a few blocks away from Officer Neal, Sergeant Tien received word over the police radio that the undercover officer had successfully purchased narcotics. Because a second male was involved in the sale, Sergeant Tien, who was in full uniform and in a marked patrol car, responded and contacted an individual matching the second suspect's description. Sergeant Tien identified this suspect in court as defendant.

After Officer Neal identified defendant as the other individual involved in the narcotic sale, Sergeant Tien arrested defendant, conducted a lawful search, and found a $20 and $1 bill in defendant's wallet. The serial number from the $20 bill found on defendant matched the prerecorded serial number

of the bill Officer Neal used to buy the "dub." Officer Neal likewise confirmed the $20 bill recovered from defendant was the same bill the officer had used to purchase the narcotic.

DISCUSSION

I

## The Court Did Not Err in Failing Sua Sponte to Conduct a *Marsden* Hearing

### A. *Additional Background*

At a March 1, 2019 hearing, defense counsel made his appearance and immediately thereafter defendant informed the court he wanted to self-represent. The court as a preliminary matter asked defendant about his eyesight, as defendant was legally blind. The defendant admitted he was unable to read documents, but nonetheless confirmed he wanted to self-represent because defense counsel had not asked certain questions at the preliminary hearing that defendant had wanted asked, and because without defendant's knowledge, counsel had hired an immigration attorney to consult with defendant. The court reassured defendant that his counsel had acted appropriately in arranging for defendant to meet with an immigration attorney.

The court next reviewed with defendant the waiver-of-right-to-counsel form. Defendant admitted that he was charged with selling or furnishing a controlled substance and with failing to appear when out of custody on bail or on his own recognizance; that there were allegations of five prior felony convictions, three prison priors (discussed *post*), and a strike prior from 2000; and that he was possibly facing more than 12 years in prison. The court reiterated it was unwise for defendant to self-represent, as he potentially could harm his case. Defendant responded he understood, and added, "I'm willing to do it by myself, not with [defense counsel]."

5

The record shows the court continued to review the waiver form with defendant, informing him if he self-represented he could not claim ineffective assistance of counsel if found guilty; he would receive no "special treatment or favors" from the court, nor could it give him legal help or advice; he would need to be fully responsible for knowing the law and his defenses, and what the prosecution was required to prove; he would have to follow the "substantive and procedural rules of law"; he alone would be responsible for "bringing any pretrial motions, selecting a jury, making opening statements, cross-examining witnesses, subpoenaing witnesses, making motions during trial, presenting final argument, and doing other tasks that are related to doing a jury trial"; he would be facing a prosecutor who is an "experienced and skilled lawyer"; and he would have to display proper courtroom decorum.

After each of these advisements by the court, the record shows defendant responded, "Yes, I understand," or words to the same effect. The record also shows defendant initialized the waiver form, and acknowledged he "knowingly and intelligently elected to represent [himself] and waived [his] right to an attorney."

The court also cautioned that because defendant was incarcerated, it would be difficult for him to contact witnesses, investigate his case, and conduct research because he might not be allowed all materials in his jail cell; and once he self-represented, if he later decided he wanted counsel reappointed the court could decide to deny that request depending on the circumstances. Defendant again stated he understood. The court therefore found defendant had an "understanding of the charges and the nature of the proceedings, that [he has] represented [himself] in the past, and as such, therefore, know[s] what it entails," adding: "You're making a knowing, voluntary, and intelligent waiver. And I'm granting your right to self-

6

representation." The court next set a status hearing to address the accommodations defendant might need given his eyesight, and agreed to continue defendant's trial about a month.

At the March 12, 2019 status conference, the court expressed concerns about defendant's ability to self-represent. Defendant was in custody and was legally blind, making trial preparation difficult, as it had come to the attention of the court that other inmates were reading documents to defendant to assist with his trial preparation. An attorney from the Office of Assigned Counsel (OAC) shared the court's concerns, suggesting defendant may be a "gray-area defendant" given his legal blindness.[3]

The court then asked defendant for his "thoughts" after hearing the concerns of the court and the attorney from OAC. Defendant replied, "I would like to represent myself for the fact that—I had a lawyer before, and my lawyer don't want to do the job that he's supposed to do. And so I heard from the other inmate—I have found things that he never told me. He was doing things that I never asked him to do like—this is a superior court case. There's no indication that he go—I'm on immigration hold. I get picked up by immigration. They can send me back to Cuba."

---

[3] The right of self-representation is not absolute. (*Indiana v. Edwards* (2008) 554 U.S. 164, 171 (*Edwards*).) Courts have discretion to deny self-representation to individuals who are sometimes called "gray-area defendants"—those who fall in the "gray area" between being competent to stand trial if represented by counsel and yet "suffer from severe mental illness [or other disability] to the point where they are not competent to conduct trial proceedings by themselves." (*Id.* at pp. 172, 174, 178; see also *People v. Johnson* (2012) 53 Cal.4th 519, 528 [confirming trial courts may deny self-representation where *Edwards* permits such a denial].)

7

Defendant told the court he needed a "Braille keyboard" as an accommodation, and reiterated he would rather "be convicted" and "go on [his] own than know somebody help[ed him] to be convicted," all while acknowledging the difficulties and "pressure" he faced as a self-represented litigant. The record shows the court was unsure whether defendant was competent to represent himself because of his inability to "review discovery and understand the evidence that might be presented against [him]." The court encouraged defendant to reconsider his decision.

The defendant gave a lengthy response, stating he knew the law and the risks of self-representation but nonetheless wanted to continue without appointed counsel. The court confirmed the trial date, set a status hearing for April 11 to ensure defendant was ready for trial, and ordered an interpreter for that hearing and for the trial because the court found it was difficult to understand defendant as English was his second language.

At the April 11 trial readiness conference, defendant complained he was not ready for the upcoming April 22 trial because he allegedly had not been given all the discovery. The prosecutor stated that as of March 29, all discovery had been turned over to defendant. The "pro per coordinator" from OAC confirmed defendant had been given eight "discovery items" including "several DVD's and CD's," and discovery bates numbered 1–24, 66–136, 141–159, and 160–292.

The defendant nonetheless complained he had not received the discovery, admitting he had not looked at the DVDs and CDs because he "cannot see." The OAC representative again expressed concern about defendant proceeding in pro per, given his inability to read the discovery and the "slight language barrier." The court asked defendant if he had

8

reconsidered having an attorney appointed. Defendant responded, "No, I got to represent myself."

The record shows the court asked the prosecutor to ensure defendant had been given all the discovery then available. After a short recess, the prosecutor confirmed the defendant had received the discovery. The court asked defendant why he was unaware he was in possession of this discovery. Defendant admitted he did not know, and continued to complain he did not have the discovery, including the police reports. With the defendant's permission, the court itself then looked through the discovery in defendant's possession. The court found defendant was in receipt of the police reports defendant claimed were missing. Nonetheless, out of an abundance of caution and because the documents were out of order, the court asked the prosecutor to "reissue the discovery," including the police reports from the July 11, 2018 incident. The representative from the OAC agreed to reprint these pages and also agreed to obtain and print defendant's preliminary hearing transcript.

At the very end of the April 11 hearing, after the court had granted defendant another trial continuance, the following colloquy occurred:

"THE DEFENDANT: And I cannot request the alternate attorney?

"THE COURT: Request a what?

"THE DEFENDANT: Alternate attorney, not public defender.

"THE COURT: Well, if you want me to reappoint your prior attorney, I will do that.

"THE DEFENDANT: My prior? No.

"THE COURT: But, no, you don't get to pick your attorney *or their office*.

"THE DEFENDANT: Okay. No." (Italics added.)

9

At the follow-up May 21 status conference, the court again considered whether to revoke defendant's pro per status. The court noted the difficulty defendant was having in preparing his defense, as evidenced by the myriad status conference hearings that had been set; defendant's inability to read the discovery, the fact English was his second language, and it was difficult to understand defendant when he spoke English; and OAC could only provide someone to read verbatim the discovery to defendant but not help him interpret it or otherwise assist with his defense.

With the assistance of an interpreter, defendant again confirmed he wanted to represent himself at trial. The court acknowledged defendant's desire to continue his self-representation, recognized defendant's blindness alone was not a basis to revoke his self-representation status, but added the fact defendant was in custody made it very difficult for him to review the discovery and prepare his defense.

The defendant responded, "Well, I am not in agreement. The truth is, Your Honor, *I don't really want to have an attorney*. I didn't do anything. Honestly, like if I'm going to get a life sentence, at least I will have done it knowing that I represented myself. And I haven't had the right equipment that I've needed to be able to prepare properly for trial. [¶] . . . I feel capable and *want to be independent* to be able to face whatever necessary. The last court it was offered to give me the same attorney that I had, but I had that person before in the past, and the same thing happened. I had to fire them. So that's what I want." (Italics added.)

After further discussion, defendant indicated he had received a Braille keyboard. The court asked defendant if having someone read the discovery to him in Spanish would be helpful. Defendant replied, "I would like to have somebody—it would have to be someone that there's enough time to talk with

10

the same way as with an attorney; someone that you can talk with about it so that they can help you debate whatever needed to be debated at court." The court again informed defendant that an interpreter would be unable to assist him in preparing a defense. Defendant then stated he was ready to go to trial that morning, and recognized he would be "fighting against a professional, against a prosecutor," adding, "But when you fall is when you—it's how you learn how to walk. So I guess that's what I'll be doing."

Two days later, there was another hearing in which the court inquired about the accommodations that were available to defendant. Representatives from OAC appeared at this hearing. The court found defendant had the absolute right to represent himself. The court noted defendant also should have someone read the discovery to him in Spanish, and if defendant needed a reader and a separate interpreter, then the court would also make that accommodation. Representatives from OAC estimated the reading of material could be completed in three or four, two-hour sittings, as there were about 350 total pages of discovery.

The court next addressed what accommodations would have to be made for defendant to review "pictures and video," noting the difficulty of having someone describe for defendant "what is in a video." The court noted it was possible an investigator appointed to defendant could review the video and describe what he or she saw. In addition, the court noted that investigator would also have to be bilingual. The court agreed to make its courtroom available to defendant to review visual media, and once again continued the trial in order to accommodate defendant.

11

The court next heard from defendant. He thanked the court for its efforts and volunteered he understood what was being said through his court-appointed interpreter. Defendant stated he could read Braille in both English and Spanish, and requested a Braille pen. Defendant also stated he had been reviewing some of the video with the help of an inmate, noting while he could not see, he was "not deaf." The court inquired whether defendant wanted a person from OAC to help him with the video. The defendant welcomed the offer, stating he would like to have a person with "some kind of training" help with the video.

The court responded that any person appointed to help with the video would have no training, and that person could only tell defendant what he or she saw. Defendant stated he understood, then added, "It's my decision to represent myself and so—and I know that, and I know that they're not going to want to risk their own job either." The record shows the interpreter sought to make a clarification, and before doing so defendant stated: "It's a decision that I made to represent myself so."

The court then observed, "[j]ust for the record it does seem as if Mr. Ortiz understands English quite well based upon some of the interchange, and the way he starts answering questions. I'm not at all saying he shouldn't have an interpreter. I'm just making a record of my observations."

The record shows defendant again expressed appreciation for the accommodations given to him, and asked if he could receive two magnifying glasses, so he could use one on top of the other to read. The court then discussed with OAC and the court clerk about obtaining a Braille pen for defendant. The court set status hearings before the trial date to ensure defendant was able to use the pen and use it effectively, and if not, to figure out what else could be done for defendant as the court wanted to avoid

12

another trial continuance.  The court then spent the remainder of the hearing addressing defendant's medical needs, including treatment for his eyes.

The record shows the court held a status hearing on July 30 to ensure defendant was receiving appropriate services in preparation for trial.  A representative from OAC informed the court that there were seven body-worn camera videos that together were about an hour-and-a-half long that still needed to be reviewed by defendant and the interpreter.  The court determined an interpreter would read the transcripts of the audio from the body-worn cameras to defendant and asked that it be completed that same day.  The court then confirmed two interpreters read several documents in Spanish to defendant on July 11, including an investigative report, a summary of some photographs and videos by defendant's investigator, and the complete preliminary hearing transcript.   Thus, with the additional materials being read to defendant later that day, the court found he would have heard all of the discovery in Spanish.

At the August 6 follow-up hearing, the court asked defendant if he needed any other accommodations as trial was about two weeks away. Defendant still had not seen a low-vision medical expert, but would before trial commenced.  Depending on the report from that expert, the court stated it would determine whether defendant should be offered additional reasonable accommodations and if so, whether a further trial continuance would be warranted.  The court indicated defendant likely had three options once the report issued:  to have counsel reappointed; to proceed to trial if no additional accommodations were recommended; or to seek a continuance if additional accommodations were recommended.  The court then refused to continue the trial date until it had the expert's report.  It cautioned

13

defendant that he should be prepared to start trial on August 19, the previously set date, pending that report.

Near the hearing's conclusion, defendant stated he would not accept the same lawyer he previously had, as he already had fired that lawyer twice; and that he would rather be sentenced to "70 years" than have the same lawyer represent him. The court replied, "We'll cross that bridge on your trial date. I'm not forcing you to take that lawyer back at this particular point in time. I'm just making clear your options."

The record shows defendant was seen by the low-vision expert on August 16. The expert opined that a low-vision aid was unnecessary for this case.

On August 20, the parties appeared before the court to begin jury selection. Before the jury pool entered the courtroom, the court informed defendant that an interpreter would have to read any documents to him during the trial, as OAC was unable to arrange having a person "sit" with defendant during trial and assist him with paperwork. Defendant complained to the court that he could "barely do anything" because he needed someone to read the documents for him, which would also make it difficult for him to question a witness about the subject matter of the documents.

The court reminded defendant he had chosen to self-represent even though he was legally blind, it had "respected that request" and made reasonable accommodations along the way, and he still had the option of having counsel reappointed before jury selection began. The court informed defendant if he chose to have counsel reappointed, the "public defender decides who is assigned, and you've made it very clear that you don't like the gentlemen who had been your previous attorney, and I can't promise you that it wouldn't be that person, [¶] *I would just appoint the public defender*. You

14

would need to give me a time waiver, and you would continue the trial afterwards. If you choose to do that, you would not be allowed, again, to go back to being pro per. . . . If you go back to having counsel—appellate appointed counsel, then that's going to be it. You're not going to be allowed to be pro per again. Those are pretty much the options we have at this particular point, and you need to make the decision that you think is best for you, *and it's all your decision*." (Italics added.)

The record shows the court offered to give defendant a "few minutes to make any final decision," but that once a jury was sworn the case was going forward. Defendant stated he appreciated the court's efforts, but that his decision "continues to be the same," adding, "I'm going to represent myself." The court noted that was "absolutely fine," that it was not trying to influence defendant in any way, and that it just needed to put that information on the record in light of his concerns about not being able to read the documents.

The prosecutor commented that the court "has done everything it can to provide the defendant with as many accommodations it can for this trial"; and that defendant "has been made well aware of the limitations on the accommodations that can be made, but it's been a painstaking process to give the defendant what he has received so far and knowing that the defendant— it appears to the People—has continued to indicate he wants to represent himself. And so I think we should move forward."

B. *Guiding Principles*

The duty to conduct a *Marsden* inquiry arises only when a defendant asserts counsel's performance has denied him or her the constitutional right to effective counsel. (*People v. Leonard* (2000) 78 Cal.App.4th 776, 787.) A defendant's motion for self-representation under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) differs from a *Marsden* motion for substitution

15

of counsel, "one raising the question of defendant's competency to waive his right to counsel, and the other raising the question of existing counsel's competency." (*People v. Burton* (1989) 48 Cal.3d 843, 855 (*Burton*).) A criminal defendant has a constitutional right to choose self-representation instead of representation by counsel. (*Faretta*, at pp. 807, 819–821.) A request for self-representation does not trigger a duty to conduct a *Marsden* inquiry or suggest substitution of counsel as an alternative. (*People v. Clark* (1992) 3 Cal.4th 41, 105, overruled on another ground as stated in *People v. Pearson* (2013) 56 Cal.4th 393, 462.)

In *Burton,* our high court found that the trial court had no duty to conduct a *Marsden* inquiry in response to the defendant's argument that the trial court had erred in failing to make such an inquiry after the defendant had made a *Faretta* motion on the basis of dissatisfaction with defense counsel, noting: "Although defendant expressed dissatisfaction with his attorney, he made repeated, explicit requests to represent himself and gave reasons why he thought he would be more persuasive and effective than counsel. He never suggested he would like a different attorney. [Citation.] Nor is it the rule that whenever a defendant makes a motion to represent himself on the basis of dissatisfaction with counsel, the court automatically should inquire whether he would like to make a motion for substitution of counsel. [Citations.]" (*Burton, supra,* 48 Cal.3d at p. 855; *People v. Lara* (2001) 86 Cal.App.4th 139, 150 [recognizing a trial court does not have a sua sponte duty to initiate a *Marsden* inquiry]; *People v. Leonard* (2000) 78 Cal.App.4th 776, 787 [same].)

When a defendant seeks to discharge his appointed counsel and substitute another attorney, a trial court must permit the defendant to explain the basis of his or her dissatisfaction with counsel and relate specific

16

examples of counsel's inadequate performance. (*Marsden, supra*, 2 Cal.3d at p. 124.) However, a trial court is required to conduct a *Marsden* hearing only if the defendant has provided " 'some clear indication' " that he or she wishes to substitute counsel. (*People v. Sanchez* (2011) 53 Cal.4th 80, 89–90 (*Sanchez*), quoting *People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. 8; *People v. Martinez* (2009) 47 Cal.4th 399, 418 [noting a "trial court's duty to conduct an inquiry into the reasons the defendant believes his or her attorney is incompetent arises only when the defendant (or in some instances counsel) provides ' "at least some clear indication" ' that the defendant wishes to substitute counsel"].)

C. *Analysis*

The record here shows defendant at the March 1, 2019 hearing did not make " 'some clear indication' " that he wanted substitute counsel. (See *Sanchez, supra*, 53 Cal.4th at pp. 89–90.) Instead, defendant unambiguously stated he wanted to represent himself because he was "dissatisf[ied]" with his counsel. (See *Burton, supra*, 48 Cal.3d at p. 855.) Specifically, defendant complained his counsel had not asked certain questions at defendant's preliminary hearing; was, according to defendant, acting like a district attorney; and had, without defendant's knowledge, retained an immigration lawyer to consult with defendant because he was from Cuba.

The record shows the court went through the waiver form with defendant, including each of the dangers and disadvantages of self-representation. Defendant initialed each of the boxes on the form and also acknowledged "he understood" the risks and disadvantages of self-representation, after the court went over them in the hearing. Despite the court's concern about self-representation because defendant was legally blind, English was not his first language, and he was in custody making

17

preparation for trial difficult, the court nonetheless found defendant was competent to self-represent, as he had an understanding of the charges against him and the nature of the proceedings, and had previously represented himself.

At the March 12 status conference, defendant also did not make " 'some clear indication' " he wanted substitute counsel. (See *Sanchez*, *supra*, 53 Cal.4th at pp. 89–90.) Instead, defendant insisted on continuing to self-represent, despite the concerns of an attorney from OAC that defendant may be a gray-area defendant and should not be allowed to represent himself.

At the follow-up April 11 status conference, defendant again clearly and unambiguously rejected the court's offer to have counsel reappointed. A representative from OAC also appeared at this hearing. During the hearing, the OAC representative offered to reprint various pages of discovery that defendant had already received. As noted, at the end of this hearing defendant asked if he could "request the alternate attorney," ostensibly referring to an attorney from OAC; and, in response to the court's question, clarified he wanted an "[a]lternate attorney, not public defender." The court offered to reappoint his prior counsel. Defendant declined, and the court then stated, "you don't get to pick your attorney *or* their office." (Italics added.)

As confirmed by defendant's other statements, the above colloquy makes clear defendant did not want substitute counsel if it meant an attorney from the public defender would be appointed. Indeed, before jury selection began on the morning of August 20, the court again offered to appoint counsel after defendant complained he could "barely do anything." However, the court specified it would merely "appoint the public defender" and it would be up to that office to decide who would be assigned to defendant's case. The court told defendant he could have a few minutes to

18

think it over and make the decision that was "best" for him. Defendant immediately informed the court he appreciated the court's efforts, but that he was going to continue to self-represent.

In addition, the record shows when the court considered revoking his self-representation status at the May 21 status conference because of the various challenges defendant faced, as summarized *ante*, defendant was clear he did not want an attorney, stating, "The truth is, Your Honor, I don't really want to have an attorney," adding, "I didn't do anything. Honestly, . . . if I'm going to get a life sentence, at least I will have done it knowing that I represented myself."

The record thus shows when defendant was confronted with the possibility of having his self-representation status revoked, he was clear he did not want *any* attorney appointed to his case. And, on the one or two occasions over the course of myriad hearings when defendant appeared open to having counsel reappointed, defendant made it clear that he did not want any attorney from the public defender's office appointed. It is axiomatic that the right to appointed counsel, however, does not include a right to counsel of one's choice. (*People v. Noriega* (2010) 48 Cal.4th 517, 522; see also *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 151.) Defendant's desire to have counsel of *his* choice or no counsel at all is inconsistent with his argument on appeal that the trial court denied him the right to a *Marsden* hearing and to the possible appointment of substitute counsel from the public defender's office.

In addition, there is nothing in the record suggesting defendant's prior counsel was constitutionally ineffective, as defendant complained only about counsel's failure to ask certain questions at the preliminary hearing and his arrangement of immigration counsel to consult with defendant, who is from Cuba. "If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law. [Citations.]" (*People v. Jones* (2003) 29 Cal.4th 1229, 1246.)

In any event, given the overwhelming evidence of guilt, as summarized *ante*, we conclude even if the court erred in not affording defendant a *Marsden* hearing—based on his request to self-represent and/or his one or two fleeting statements that he *might* consider reappointment of counsel as long as counsel was *not* from the public defender's office, it was harmless as the record shows beyond a reasonable doubt that defendant would not have achieved a more favorable result had new counsel been appointed. (See *Chapman v. California* (1967) 386 U.S. 18; see also *People v. Winn* (2020) 44 Cal.App.5th 859, 871 [trial court's error in denying the defendant's *Marsden* motion without conducting a further inquiry was "harmless beyond a reasonable doubt" because the evidence of the defendant's guilt was "overwhelming"]; *People v. Washington* (1994) 27 Cal.App.4th 940, 944 [noting "*Marsden* does not establish a rule of per se reversible error," and concluding, after reviewing counsel's actions, that "no grounds for claiming ineffective assistance of counsel exist" and that, even though the trial court failed to hold a hearing on the *Marsden* motion, the appointment of a different attorney could not have had "any effect on the sentence imposed"].)

## II
### Amended Section 667.5

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b) regarding prior prison term enhancements. (See Stats. 2019, ch. 590.) Former section 667.5, subdivision (b) imposed an additional one-year term for each prior separate prison term or county jail felony term, except under specified circumstances. However, newly amended section 667.5, subdivision (b) imposes that additional one-year term only for each prior separate prison term served for a conviction of a sexually violent offense. (§ 667.5, subd. (b); see *People v. Jennings* (2019) 42 Cal.App.5th 664, 682 [noting "[b]y eliminating section 667.5, subdivision (b) enhancements for all prior prison terms except those for sexually violent offenses, the Legislature clearly expressed its intent in Senate Bill No. 136 . . . to reduce or mitigate the punishment for prior prison terms for offenses other than sexually violent offenses"].)

Here, the parties agree, and the record shows, that defendant's three prison priors were for nonsexually violent offenses. (See Welf. & Inst. Code, § 6600, subd. (b).) Defendant's case is not yet final. We agree with the parties that Senate Bill No. 136 applies retroactively to defendant (see *In re Estrada* (1965) 63 Cal.2d 740); and therefore, that his three, one-year prior prison enhancements must be stricken. Because the trial court exercised discretion in selecting the middle rather than the upper term when sentencing defendant, we find remand for resentencing is appropriate. (*People v. Buycks* (2018) 5 Cal.5th 857, 893, 896, fn. 15.)

21

## III
### Inability to Pay Hearing

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant next contends the court erred when it failed to make a finding of ability to pay before imposing a restitution fine of $2,700 (§ 1202.4) and a matching suspended parole revocation fine (§ 1202.45); a $40 court security fee (§ 465.8); a $30 criminal conviction assessment (Gov. Code, § 70373); a $154 criminal justice administration fee (*id.*, § 29550.1); and a $205 drug program fee, including penalty assessment (Health & Saf. Code, § 11372.5).

Defendant's sentencing took place in September 2019, about nine months after *Dueñas* issued. He therefore knew, or should have known, of his right to object to the imposed fines, fees, and assessments under *Dueñas*. (See *People v. Taylor* (2020) 43 Cal.App.5th 1102, 1114 [defendant forfeited his *Dueñas* claims because he did not object to fines and fees in the trial court].) In addition, section 1202.4, subdivision (d), allows a court to consider a defendant's inability to pay if a fine is imposed above the statutory minimum amount of $300 for a felony conviction, as was the case here. (See § 1202.4, subds. (b)(1) & (d).)

Nonetheless, because we are remanding for resentencing, we conclude under the unique circumstances of this case that defendant can raise the issue of his ability to pay the fines, fees, and assessments at his resentencing, where the trial court may consider additional evidence pertinent to that issue that is currently not before this court.

### DISPOSITION

Defendant's three, one-year enhancements imposed under former section 667.5, subdivision (b) are stricken. Defendant at resentencing may raise his "*Dueñas* claim" of inability to pay the fines, fees, and assessments,

an issue we have intentionally left unresolved in this appeal.  Following resentencing, the court shall forward an amended abstract of judgment to the appropriate authorities.  In all other respects, the judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.